2014 UT App 5

**STATE of Utah, Plaintiff and Appellee,**

v.

**Troy Dean LABRUM, Defendant and Appellant.**

No. 20120678–CA.

Court of Appeals of Utah.

Jan. 9, 2014.

Adam Alba, Salt Lake City, for Appellant.

Simarjit S. Gill and Thomas V. Lopresto II, for Appellee.

Judge CAROLYN B. McHUGH authored this Opinion, in which Judges GREGORY K. ORME and STEPHEN L. ROTH concurred.

McHUGH, Judge:

¶ 1 Troy Dean Labrum appeals from a conviction for assault, enhanced to a class A misdemeanor for causing substantial bodily injury. *See* Utah Code Ann. § 76–5–102(1), (3)(a) (LexisNexis 2012). Labrum challenges the admission of evidence at trial relating to prior alleged assaults. He also argues that the evidence of substantial bodily injury was insufficient to support his conviction. We affirm.

## BACKGROUND

¶ 2 Labrum's conviction arose out of an altercation during the early hours of March 6, 2011, between Labrum and his then-wife (Wife).[1] The couple initially began to argue over Wife's attempts to clean their house and to repair a damaged wall in their basement with spackling paste. Labrum followed Wife while she was cleaning and repairing the house, yelling at her because he

was irritated by the smell of the spackling paste she was using to repair the drywall. During a break in the argument, around 1:00 a.m., Wife noticed that Labrum had gone to the basement. She decided to go to sleep and turned off the lights on the main floor of the house. Around 2:30 a.m., Labrum ran upstairs screaming at Wife that she had turned off the lights " 'on purpose to make [him] mad.' " After Labrum left the bedroom, Wife decided to leave the house because she believed that Labrum would become violent. She got her purse and a set of keys and walked out the door. However, she quickly changed her mind and returned to bed while still holding the set of keys.

¶ 3 At this point, Wife's and Labrum's versions of events diverge. According to Wife, Labrum returned to the bedroom and asked her to move over so that he could get in the bed. When Wife told him to sleep in another room, Labrum began to strike Wife in the face with a full Gatorade bottle, hitting her a total of six times across her face. By the third blow, Wife was able to pull the covers over her head in an attempt to block Labrum's attacks. After Labrum stopped hitting Wife, she put her hands down and positioned the set of keys so that an individual key was protruding between each of her fingers. Labrum then "flopped down onto [her]," landing on the keys. Labrum got up, spun around, and punched Wife on the right side of her forehead. Before Labrum walked out of the room, he stated, " 'I told you never to touch me' " and, " 'You deserve what you get.' " Wife fled to her mother's house, and Wife's mother immediately drove her to the hospital.

¶ 4 Labrum's account differed markedly from Wife's. According to Labrum, he went upstairs to go to bed but was unable to turn on the bedroom lights because they were controlled by a remote that was not by the entrance to the room. As Labrum went to sit on the bed, he "started feeling punches in [his] back" and felt something pierce him in his back. Labrum then swung his arm back

---

1. "When reviewing a jury verdict, we examine the evidence and all reasonable inferences drawn therefrom in a light most favorable to the verdict, and we recite the facts accordingly." *State v. Kruger*, 2000 UT 60, ¶ 2, 6 P.3d 1116. "We present conflicting evidence only when necessary to understand issues raised on appeal." *Id.*

while holding a Gatorade bottle, not intentionally but out of "instinct." He acknowledged that his arm must have struck Wife's head but claimed that he did not hit Wife more than once. When Wife yelled and turned on the lights, Labrum noticed that she had keys protruding between her fingers. Wife then left the house.

¶ 5 The State charged Labrum with class A misdemeanor assault for causing substantial bodily injury. The magistrate bound him over for trial after a preliminary hearing on July 14, 2011. Labrum filed a motion to quash the bindover on the ground that the State had failed to produce sufficient evidence that Wife suffered "substantial bodily injury." The trial court denied the motion.

¶ 6 On February 24, 2012, the State filed a notice of intent to introduce evidence pursuant to rule 404(b) of the Utah Rules of Evidence.[2] Specifically, the State wanted to introduce Wife's testimony that she took the keys to bed and placed them between her fingers to protect herself from Labrum, who had physically attacked her three times in the eight months prior to the March 6, 2011 attack. Because Labrum had indicated that self-defense would be an issue at trial, the State also sought to admit the evidence to overcome any suggestion that Labrum was acting in self-defense.

¶ 7 The proposed other acts evidence included an incident in August 2010, where an argument between the couple escalated to the point that Labrum pushed Wife against a couch. When Wife got up and tried to walk away, Labrum pushed her down the stairs and walked on top of her.[3] Although Wife called the police, when they arrived at the house she told them that there was no need to make a formal report. Wife later claimed that she did so because Labrum threatened that if the police entered the house, he would

kill her and them. There is no written report of the incident in the record. The second prior incident occurred on February 5, 2011, when Labrum became upset because Wife was "leaving to go to [her] parent's home to borrow some money." Labrum flipped Wife off and he "ran his finger[nail] ... up the side of [her] face and cut the side of [her] face up through [her] eyelid." Wife did not call the police after this altercation. The third prior incident occurred on February 23, 2011. Wife and Labrum were engaged in a heated discussion when Labrum punched a hole in the bedroom door, kicked out two bathroom vanity doors, strangled Wife, threw her against the wall when she tried to walk away, threatened to take Wife to the Great Salt Lake and shoot her, and threatened that "after he finished [Wife] off[,] he would take care of [Wife's] family." Wife did not call the police to report this incident either. And although Labrum's nine-year-old daughter stayed with Wife and Labrum about half of the time, she was not present during any of these prior attacks.

¶ 8 Labrum objected to the introduction of the other acts evidence and filed a memorandum in support of his objection. Labrum argued that the incidents were not offered for a proper purpose, that they were irrelevant and unfairly prejudicial, and that the admission of this evidence would confuse the issues, mislead the jury, and waste the trial court's time.

¶ 9 After a hearing on March 5, 2012, the trial court granted the State's motion, allowing the introduction of the other acts evidence at trial. In its written order, the trial court indicated that the other acts evidence was "admissible for the proper non-character purposes of (1) showing [Wife's] state of mind/providing context to her decision to bring keys with her to bed before the alleged

---

2. Rule 404(b) provides,

Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character.... This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

3. In the State's motion in limine to admit the other acts evidence, the State proffered a statement from Wife that Labrum "pushed [her] against the stairs" and then walked on top of her to get up the stairs. At trial, however, Wife testified that Labrum pushed her "down the stairs" and then walked on top of her.

assault and (2) to rebut [Labrum's] claim of self-defense." The trial court then determined that the evidence was relevant under rules 401 and 402 "for the same reasons."[4] The trial court also determined that the probative value of the three prior incidents was not substantially outweighed by the danger of unfair prejudice under rule 403, and that the evidence was therefore admissible under rule 404(b).[5]

¶ 10 During a one-day jury trial, Wife recounted her version of the March 6, 2011 attack. Wife also indicated that when she went to the hospital, she was told that she had suffered a contusion on her forehead as well as severe bruising and swelling of her face and eyes. She explained that the hospital staff called the police. The responding officer took Wife's statement and numerous photographs of her injuries. Wife testified that the bruising and swelling on her face lasted for over two weeks, that she could not keep her eyes open for very long during that period of time, and that she had to apply ice to her injuries periodically in order to see out of both eyes. Wife also indicated that she was unable to perform her job as a second-grade teacher during that time due to the magnitude of the swelling and bruising and because she believed her appearance would frighten her students. Through Wife, the State introduced twelve photographs showing the progression of Wife's injuries: two photographs taken at the hospital on March 6, 2011; four photographs taken on March 7, 2011, about twenty-four hours after the incident; and six photographs taken on March 8, 2011, about forty-eight hours after the incident.

¶ 11 Next, Wife testified that she took the keys to bed with her "[f]or protection [from Labrum's] rage." The prosecutor asked Wife why she felt she needed protection, and Wife said it was because of "past events that had occurred in the marriage." At that point, the trial court interjected and gave a verbal instruction to the jurors that the other acts evidence that they were about to hear was being admitted to help the jury "in determining whether Mr. Labrum acted intentionally on March 6th and on the issue of whether there [was] self defense," and not to show that Labrum was "a person of bad character." The trial court cautioned the jury that Labrum was not on trial for those past events but only for the March 6, 2011 incident. Thereafter, Wife gave her account of the three prior incidents of violence. The detective who was assigned to investigate the March 6, 2011 domestic violence incident between Labrum and Wife testified that he reviewed dispatch records and confirmed that Wife called the police in August 2010 and that the call was initially categorized as a domestic violence incident but had then been recategorized as a "public assist." The State introduced a photograph of Wife's face that Wife had taken herself after the February 5, 2011 incident that showed a cut across her eyelid and cheek. The State also introduced four photographs of the damage that Labrum caused in the house after the February 23, 2011 incident.

¶ 12 At the close of the State's case, Labrum moved for a directed verdict on the ground that the State had failed to present sufficient evidence of "substantial bodily injury." The trial court denied that motion, indicating that the jury "could find this was protracted physical pain" and that having "a black eye for two weeks" could amount to "temporary disfigurement."

¶ 13 Thereafter, Labrum testified on his own behalf. In addition to testifying about his recollection of the March 6, 2011 altercation, Labrum offered his own version of events relating to the prior incidents. Labrum testified that he recalled having an argument with Wife in August 2010 but that there was no physical contact between them. He

---

4. Rule 401 provides, "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Rule 402 provides that "[r]elevant evidence is admissible" except as otherwise provided by rule, statute, or constitution, and that "[i]rrelevant evidence is not admissible."

5. Rule 403 provides, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

further testified that on February 5, 2011, he and Wife had an argument about money, and as he was leaving, he "flipped [Wife] off." He testified that Wife ran at him, slapped him, and knocked the door shut, and that Wife received the cut on her face after running into his finger while it was extended toward her. As to the February 23, 2011 incident, Labrum claimed that he had never threatened, touched, or strangled Wife. However, Labrum acknowledged that he did break the cabinet doors depicted in the photographs of the incident.

¶ 14 After the close of evidence, the trial court instructed the jury on the applicable law, which included an instruction on self-defense. During closing argument, the prosecutor argued that Labrum assaulted Wife and caused substantial bodily injury. Other than one brief reference, the prosecutor did not address the other acts evidence in closing arguments.[6] Labrum's trial counsel argued that Labrum acted in self-defense, contending that Wife decided "to lie in wait, to wait for him in the dark and ambush him with a set of keys."

¶ 15 The jury found Labrum guilty of assault, enhanced to a class A misdemeanor because Wife had suffered substantial bodily injury. Thereafter, Labrum was sentenced to ninety days in jail and was placed on probation for a period of twenty-four months. Labrum now appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 16 Labrum contends that the trial court abused its discretion when it admitted evidence of other uncharged acts under rule 404(b) of the Utah Rules of Evidence. "A trial court's admission of other acts evidence is reviewed for abuse of discretion, but the evidence 'must be scrupulously examined by trial judges in the proper exercise of that discretion.'" *State v. Verde*, 2012 UT 60, ¶ 13, 296 P.3d 673 (quoting *State v. Decorso*, 1999 UT 57, ¶ 18, 993 P.2d 837).

---

¶ 17 Labrum also contends that the State failed to set forth evidence supporting the jury's determination that Wife suffered "substantial bodily injury." In reviewing a claim of insufficient evidence, we "view[ ] the evidence and all inferences drawn therefrom in a light most favorable to the jury's verdict." *State v. Holgate*, 2000 UT 74, ¶ 18, 10 P.3d 346. "We will only conclude that the evidence was insufficient if it 'is sufficiently inconclusive or inherently improbable such that reasonable minds must have entertained a reasonable doubt that the defendant committed the crime for which he or she was convicted.'" *State v. Samples*, 2012 UT App 52, ¶ 9, 272 P.3d 788 (quoting *Holgate*, 2000 UT 74, ¶ 18, 10 P.3d 346).

## ANALYSIS

### I. Other Acts Evidence

¶ 18 Labrum first argues that the trial court abused its discretion by admitting evidence of other uncharged acts. "Rule 404(b) of the Utah Rules of Evidence instructs that '[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith.'" *State v. Marchet*, 2009 UT App 262, ¶ 28, 219 P.3d 75 (alteration in original) (quoting a prior but substantively similar version of rule 404(b)). "However, rule 404(b) does allow for the admission of bad acts evidence for other purposes, 'such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *Id.* (quoting a prior but substantively similar version of rule 404(b)). Thus, evidence offered under rule 404(b) is " 'admissible if it is relevant for a non-character purpose and meets the requirement of Rules 402 and 403.' " *Id.* (quoting Utah R. Evid. 404 advisory committee note).

¶ 19 Traditionally, "[a] decision as to the admissibility of bad acts evidence involve[d] a three-step process." *Id.* ¶ 29; *see also State v. Nelson–Waggoner*, 2000 UT 59, ¶¶ 18–20, 6

---

6. The prosecutor did, however, discuss the other acts evidence in her opening statement. The prosecutor stated that Wife took the keys to bed with her "because three times prior to this night and this argument, verbal arguments with the

defendant ended with physical violence." After briefly describing the three incidents, the prosecutor said, "So [Wife] goes to sleep ... with these in mind and with those keys in her hand."

P.3d 1120. Under this three-part analysis, the trial court must first determine whether the other acts evidence "is being offered for a proper, noncharacter purpose, such as one of those specifically listed in rule 404(b)." *Nelson–Waggoner*, 2000 UT 59, ¶ 18, 6 P.3d 1120. "[I]f the trial court concludes that the bad acts evidence is 'being offered only to show the defendant's propensity to commit crime, then it is inadmissible and must be excluded at that point.'" *Marchet*, 2009 UT App 262, ¶ 29, 219 P.3d 75 (quoting *Nelson–Waggoner*, 2000 UT 59, ¶ 18, 6 P.3d 1120). In contrast, if the trial court is convinced that the purpose of the evidence is proper, it "must [next] determine whether the bad acts evidence meets the requirements of rule 402, which permits admission of only relevant evidence." *Nelson–Waggoner*, 2000 UT 59, ¶ 19, 6 P.3d 1120; *see also Decorso*, 1999 UT 57, ¶ 22, 993 P.2d 837 ("[U]nless the other crimes evidence tends to prove some fact that is material to the crime charged—other than the defendant's propensity to commit crime—it is irrelevant and should be excluded by the court pursuant to rule 402."). If the other acts evidence is relevant and offered for a proper purpose, the trial court "must analyze the evidence in light of rule 403 to assess whether its probative value is substantially outweighed by the risk of unfair prejudice to the defendant." *Marchet*, 2009 UT App 262, ¶ 29, 219 P.3d 75 (citing *Nelson–Waggoner*, 2000 UT 59, ¶ 20, 6 P.3d 1120). In *State v. Verde*, 2012 UT 60, 296 P.3d 673, the Utah Supreme Court considered the relevance of the other acts evidence as integral to an analysis of the first and third parts of the traditional test and did not address it as a separate step of the analytical framework. *See id.* ¶¶ 14–18, 26, 40, 57. We follow that approach here by undertaking our analysis in two parts, both of which require us to focus on the relevance of the other acts evidence under the facts of this case.

## A. Noncharacter Purpose

¶ 20 We first determine whether the trial court exceeded its discretion in determining that the evidence was offered for a proper, noncharacter purpose. The State asserts that the other acts evidence was offered for the proper, noncharacter purposes of estab-

lishing Wife's state of mind, providing context for her actions, and establishing that Labrum acted intentionally and not in self-defense.

¶ 21 "Fidelity to [rule 404(b) ] requires a threshold determination of whether proffered evidence of prior misconduct is aimed at proper or improper purposes. If such evidence is really aimed at establishing a defendant's propensity to commit crime, it should be excluded despite a proffered (but unpersuasive) legitimate purpose." *Verde*, 2012 UT 60, ¶ 17, 296 P.3d 673 (citations and internal quotation marks omitted). Furthermore, the fact which the other acts evidence is being offered to prove must be contested and material to the charged offense. *Id.* ¶¶ 21–26; *State v. Decorso*, 1999 UT 57, ¶ 22, 993 P.2d 837.

¶ 22 Rule 404(b) specifically provides that other acts evidence is admissible to show proof of "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Utah R. Evid. 404(b)(2). Thus, evidence may be admissible under rule 404(b) to rebut a defense that the defendant lacked the requisite intent to commit a crime. *See State v. Fedorowicz*, 2002 UT 67, ¶ 30, 52 P.3d 1194 ("Evidence is admissible under rule 404(b) to rebut a defense of accidental injury. . . ."); *State v. Widdison*, 2000 UT App 185, ¶ 33, 4 P.3d 100 (holding that other acts evidence was admissible where the "defendants made statements to both the police and other witnesses which put absence of mistake or accident at issue"). Furthermore, the list of noncharacter purposes in rule 404(b) "is not exhaustive." *State v. Allen*, 2005 UT 11, ¶ 17, 108 P.3d 730. For example, in *State v. Bates*, 784 P.2d 1126 (Utah 1989), our supreme court approved of the admission of testimony about a defendant's other acts because the testimony was offered to show the victim's state of mind—namely, the victim's fear of the defendant—in order to explain the victim's delay in reporting the charged abuse. *Id.* at 1127–28; *accord State v. Harter*, 2007 UT App 5, ¶ 28, 155 P.3d 116 ("[T]he trial court acknowledged that [the victim's] testimony about her prior injuries

was offered for the proper, noncharacter purpose of demonstrating [the victim's] state of mind—her fear of [the d]efendant."). Additionally, other acts evidence may be admissible under rule 404(b) to show context. *State v. Havatone,* 2008 UT App 133, ¶ 10, 183 P.3d 257; *see also State v. Dominguez,* 2003 UT App 158, ¶ 21, 72 P.3d 127 (concluding that evidence had been admitted for a proper, noncharacter purpose when "the trial court's ruling limited testimony to that necessary as context for admissible evidence"); *State v. Morgan,* 813 P.2d 1207, 1210 n. 4 (Utah Ct.App.1991) ("[T]he prosecutor is entitled to paint a factual picture of the context in which the events in question transpired."). Our supreme court recently acknowledged this valid purpose, stating that the prosecutor retains "the right to present evidence with broad narrative value beyond the establishment of particular elements of a crime." *Verde,* 2012 UT 60, ¶ 28, 296 P.3d 673 (internal quotation marks omitted). But the supreme court cautioned that such evidence has "no legitimate narrative value" "where it is not plausibly linked to any charged conduct." *Id.* ¶ 29. Accordingly, other acts evidence admitted to provide context must be carefully limited to narrative evidence offered in support of the elements of the crime at issue.

██ ¶ 23 Here, the prosecutor offered the other acts evidence for the proper purpose of rebutting Labrum's testimony that he instinctively hit Wife with the Gatorade bottle in self-defense.[7] The evidence of Labrum's prior acts of violence against Wife supports Wife's testimony that she armed herself with the keys to protect herself and not, as Labrum contends, to ambush Labrum when he came to bed. As the trial court noted, "The taking [of] some type of a weapon to bed with someone has to be explained...." Without an understanding that Wife had reason to fear Labrum, the State would be unable to explain why she brought the keys to bed and would be unable to challenge effectively Labrum's testimony that Wife was the aggressor and that he was merely defending himself. The other acts evidence was thus directly relevant to the contested issues of Wife's actions and state of mind and whether Labrum was acting in self-defense. *Cf. State v. Holbert,* 2002 UT App 426, ¶ 37, 61 P.3d 291 (stating that a prior instance of domestic violence perpetrated by the defendant against the same victim was relevant to refute the defendant's claim that the victim was the perpetrator in the charged episode). *See generally* Utah R. Evid. 401 (defining relevant evidence). Accordingly, the trial court did not exceed its discretion when it determined that the other acts evidence was presented for the proper, noncharacter purpose of establishing Wife's fear of Labrum when she armed herself with the keys, thereby helping to rebut Labrum's self-defense claim.

## B. Rule 403 Analysis

¶ 24 Next, we must determine whether the trial court exceeded its discretion in concluding that the three prior incidents of domestic violence were admissible under rule 403 of the Utah Rules of Evidence. Rule 403 states, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

██ ¶ 25 Evidence that is "genuinely being offered for a proper, non-character purpose" may also carry "a risk of an undue inference that the defendant committed each act because of the defendant's immoral character." *State v. Verde,* 2012 UT 60, ¶¶ 18, 51, 296 P.3d 673. A rule 403 analysis of other acts evidence thus focuses on balancing the proper inferences against the improper inferences and "excluding the bad acts evidence if its tendency to sustain a proper inference is outweighed by its propensity for an improper inference or for jury confusion about its real purpose." *Id.* ¶ 18. In balancing the probative value of other acts evidence against "[i]ts tendency to lead the finder of fact to an improper basis for decision," Utah courts have traditionally considered what have come to be known as the *Shickles* factors. *See*

---

7. The trial court instructed the jury that the evidence was being offered only to establish Labrum's intent and whether he acted in self-defense.

*State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988), *abrogated on other grounds by State v. Doporto*, 935 P.2d 484 (Utah 1997). The *Shickles* factors include the following:

> "[1] the strength of the evidence as to the commission of the other crime, [2] the similarities between the crimes, [3] the interval of time that has elapsed between the crimes, [4] the need for the evidence, [5] the efficacy of alternative proof, and [6] the degree to which the evidence probably will rouse the jury to overmastering hostility."

*Id.* at 295–96 (quoting Edward W. Cleary et al., *McCormick on Evidence* § 190, at 565 (3d ed.1984)).

### 1. Relevance of the *Shickles* Factors in Light of *State v. Verde*

¶ 26 The Utah Supreme Court's recent decision in *Verde* has left the continuing relevance of the *Shickles* factors somewhat uncertain.[8] In *Verde*, the defendant, who was charged with child sexual abuse, challenged the trial court's admission of evidence that he had previously sexually assaulted two eighteen-year-olds. *See* 2012 UT 60, ¶¶ 1–3, 296 P.3d 673. This court affirmed the trial court's decision admitting the evidence, and the supreme court granted the defendant's petition for certiorari review. *See id.* ¶ 1. Before the supreme court, the state argued that the evidence was admissible to establish the defendant's specific intent, demonstrate the defendant's plan to engage in criminal activity, and rebut his claim that the child victim had fabricated the allegations. *See id.* ¶ 20. The supreme court rejected the specific intent purpose advanced by the state because the defendant had not placed that element at issue. *See id.* ¶ 25. The court rejected the plan purpose as based on an overly broad definition of "plan." *See id.* ¶¶ 39–40. Finally, the court refused to affirm on the fabrication purpose

because the state had not asked the trial court to admit the other acts evidence on that basis. *See id.* ¶¶ 44–62. To assist the trial court on remand if the fabrication purpose was advanced during the new trial, the supreme court identified limitations on the use of other acts evidence to rebut a defendant's claim that the victim fabricated the charges. *See id.* ¶ 56. The court adopted the doctrine of chances as the basis for those limitations, explaining, "Under the doctrine of chances, evidence offered to prove *actus reus* must not be admitted absent satisfaction of four foundational requirements, which should be considered within the context of a rule 403 balancing analysis."[9] *See id.* ¶¶ 56–57. Specifically, the supreme court identified materiality, similarity, independence, and frequency as foundational requirements under the doctrine of chances. *See id.* ¶¶ 57–61.

¶ 27 In *Verde*, the supreme court did not apply the doctrine of chances when assessing the admissibility of the other acts evidence to prove specific intent or plan under rule 403. *See id.* ¶¶ 21–32, 40–41. Nor did it consider each of the *Shickles* factors in its analysis of specific intent or plan. Instead, the court referred to only one of those factors—the prosecution's need for the evidence—in rejecting the state's claim that the prior sexual assault evidence was admissible to establish the defendant's specific intent, *see id.* ¶ 26 & n. 6, and another *Shickles* factor—the similarity of the evidence—in rejecting the state's claim that the prior sexual assault evidence was admissible to establish the defendant's plan to engage in criminal activity, *see id.* ¶¶ 40–41.

¶ 28 Where the context involves a doctrine of chances analysis, we read *Verde* as having displaced the *Shickles* factors—for purposes of assessing the "probative value" aspect of the rule 403 analysis—with a focus on mate-

---

8. The supreme court issued *State v. Verde*, 2012 UT 60, 296 P.3d 673, after Labrum's case had been tried and his notice of appeal filed.

9. The doctrine of chances is a "theory of logical relevance," which a proponent may use to argue that, using "probability reasoning," a factfinder may infer that a disputed fact is more likely or less likely to be true due to the recurrence of

some improbable event. *See Verde*, 2012 UT 60, ¶¶ 47–61, 296 P.3d 673. For example, "[a]n innocent person may be falsely accused or suffer an unfortunate accident, but when several independent accusations arise or multiple similar 'accidents' occur, the objective probability that the accused innocently suffered such unfortunate coincidences decreases." *Id.* ¶ 49.

riality, similarity, independence, and frequency. *See id.* ¶¶ 57–61. With respect to the "risk of unfair prejudice" aspect of the rule 403 analysis, *Verde* focuses on the risk that the jury may draw an improper "character" inference from the evidence or that it may be confused about the purpose of the evidence. When addressing the probative value of the other acts evidence in cases not governed by the doctrine of chances, the *Shickles* factors remain relevant to the extent they are useful. Under either analysis, *Verde* instructs that the prejudice inquiry is focused generally on the extent to which the "tendency [of the other acts evidence] to sustain a proper inference is outweighed by its propensity for an improper inference or for jury confusion about its real purpose." *See id.* ¶ 18; *Shickles,* 760 P.2d at 295 (noting that what have come to be called the *Shickles* factors are relevant to the balancing of the "tendency [of the other acts evidence] to lead the finder of fact to an improper basis for decision" against the "probative value and the need for such evidence in proving a particular issue"). Thus, even where the doctrine of chances does not apply, the trial court need not rigidly apply or limit its analysis to the *Shickles* factors. Rather, the trial court should carefully weigh the tendency toward proper and improper inferences from the other acts evidence in the context of the particular case and consider whatever factors are relevant to that analysis as it "scrupulously examine[s]" the evidence. *See Verde,* 2012 UT 60, ¶ 13, 296 P.3d 673 (citation and internal quotation marks omitted). We now consider which analytical framework is appropriate here.

¶ 29 In *Verde,* the supreme court "acknowledge[d] the theoretical possibility that evidence of prior misconduct could be admitted under rule 404(b) to establish commission of a criminal *actus reus* by rebutting a charge of fabrication." *Id.* ¶ 46; *see also id.* ¶¶ 44–62. The supreme court also indicated that the doctrine of chances could be employed to assess other acts evidence offered to rebut a claim of accident. *See id.* ¶ 49. And the authorities cited favorably in *Verde* suggest that the doctrine also applies to assessing the admissibility of other acts evidence offered to rebut a defense of mistake. *See id.* ¶ 48 & n. 17 (citing *United States v. Russell,* 19 F. 591,

592 (W.D.Tex.1884), for the proposition that "'[t]he chances of mistake decrease in proportion as the alleged mistakes increase'"); *id.* ¶ 49 & n. 22 (citing David P. Leonard, *The New Wigmore: A Treatise on Evidence: Evidence of Other Misconduct and Similar Events* § 7.3.2 (2009), for its discussion of "Wigmore's classic example of a hunter 'mistakenly' shooting toward a hunting partner multiple times"). Cases and commentaries have also discussed and applied the doctrine to assess evidence offered to establish intent by rebutting a claim of self-defense. *See, e.g., State v. Monroe,* 364 So.2d 570, 571–73 (La.1978) ("The evidence of the subsequent act, which was strikingly similar, had great probative value to show the improbability that the defendant acted in self defense or without requisite intent in strangling two derelicts on successive nights at the same spot on the river batture."); Leonard, *supra,* § 7.3.2, at 437–38, § 7.5.2, at 458–62 (discussing examples of other acts evidence used to rebut a claim of self-defense and cautioning that in such cases, ignoring differences among charged and uncharged conduct "reveal[s] lack of understanding of the nuanced nature of doctrine of chances logic and of the danger of eviscerating the character evidence ban").

¶ 30 Whether the doctrine of chances applies depends on why the other acts are relevant. Other acts evidence is relevant if it has any tendency to make a consequential fact more probable or less probable. *See* Utah R. Evid. 401. If that tendency lies in the improbable repetition of a similar event, the doctrine of chances applies. *See State v. Verde,* 2012 UT 60, ¶¶ 47–61, 296 P.3d 673; 1 Edward J. Imwinkelried, *Uncharged Misconduct Evidence* § 5.06, at 16 (1999); Leonard, *supra,* § 7.3.2, at 438. Under the doctrine of chances, "the inference of mens rea arises from the implausibility of the defendant's claim of successive similar innocent acts." 1 Imwinkelried, *supra,* § 5.08, at 25 (citation and internal quotation marks omitted). Thus, "'it is the mere repetition of instances ... that satisfies our logical demand.'" *United States v. Queen,* 132 F.3d 991, 996 (4th Cir.1997) (omission in original) (quoting 2 John H. Wigmore, *Wigmore*

*on Evidence* § 302, at 245 (James H. Chadbourn ed., rev. ed.1979)); *see also State v. Johns,* 301 Or. 535, 725 P.2d 312, 323 (1986) (en banc) (" '[A]n unusual and abnormal element might perhaps be present in one instance, but the oftener similar instances occur with similar results, the less likely is the abnormal element likely to be the true explanation of them.' " (quoting 2 Wigmore, *supra,* § 302, at 241)).

¶ 31 In the present case, Labrum argued that he instinctively hit Wife in self-defense. As discussed above, the prosecutor offered the other acts evidence for the proper purpose of establishing Labrum's intent by rebutting his self-defense claim. *See supra* ¶¶ 20–23. Specifically, the prosecutor elicited the other acts evidence to explain Wife's state of mind. Therefore, as noted above, the other acts evidence was relevant because of its tendency to make it more likely that Wife brought her keys to bed to protect herself in the event Labrum became violent, and not to attack Labrum.[10] *See supra* ¶ 23. The theory of relevance advanced by the State thus differs from a theory grounded in the doctrine of chances, which would establish relevance by arguing that the repetition of several distinctively similar acts of domestic violence in which Labrum did not act in self-defense tends to make it less likely that Labrum acted in self-defense on March 6, 2011. *See Johns,* 725 P.2d at 323 (" '[T]he recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative ... self-defense ... or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e. criminal, intent accompanying such an act....' " (quoting 2 Wigmore, *supra,* § 302, at 241)). Instead, the other acts evidence here was offered to prove Wife's state of mind when she took the keys to bed, a factual issue not grounded in the repeated occurrence of an improbable event.

¶ 32 Whatever the merits of a doctrine of chances analysis under the circumstances of this case, we do not address it. When other acts evidence is relevant to a legitimate, proffered purpose and otherwise admissible, we need not analyze the other acts evidence under alternative theories of relevance. *Cf. Verde,* 2012 UT 60, ¶¶ 32–33, 62–63, 296 P.3d 673 (concluding that the other acts evidence in question was inadmissible to prove plan or intent, but acknowledging that in a new trial the state could potentially establish that the same evidence was admissible under the doctrine of chances to rebut a defense of fabrication). Therefore, we review the trial court's rule 403 decision in light of the tendency of the other acts evidence to sustain a proper, rather than an improper, inference, without relying on the doctrine of chances.

2. Application of the Relevant *Shickles* Factors [11]

¶ 33 Labrum argues that the evidence here should not have been admitted because the prior incidents of domestic violence were unreported and uncorroborated. While the evidence could be stronger, it is not as weak as Labrum suggests. The first incident was corroborated by a detective's testimony at trial that dispatch records revealed a call by Wife to the police in August 2010 that was initially logged as a domestic violence incident but ultimately changed to a "public assist." The second incident was corroborated by a photograph of the scratch on Wife's face that she took the day of that incident. The third incident was corroborated by four photographs, taken the day of that incident, showing the holes in the bedroom door and bathroom vanity that Labrum had punched or kicked. The other acts evidence was sufficiently strong to support the inference for which it was offered.

¶ 34 Labrum claimed that he struck Wife in a justified effort to defend himself. If

10. A contrary inference could be drawn that repeated acts of domestic violence make it more likely that Wife would have been driven to retaliate against Labrum. But it was for the jury to determine which competing inference to draw.

11. The *Shickles* factors relevant to the probative value of other acts evidence include evidentiary strength, similarity, temporal proximity, and necessity. *See State v. Shickles,* 760 P.2d 291, 295–96 (Utah 1988), *abrogated on other grounds by State v. Doporto,* 935 P.2d 484 (Utah 1997).

Wife's taking the keys with her to bed was left without explanation, the jury might have inferred, as Labrum suggests, that she intended to ambush him with the keys. Even without corroboration for all of the details of the incidents, the evidence that prior arguments between the couple had resulted in at least one domestic violence call to the police, damaged furniture, and some injury to Wife was highly relevant to her state of mind at the time of the charged incident and why she felt she needed to protect herself. Although the incidents are not identical to each other or to the charged conduct, each involved Labrum attacking Wife in their house when his daughter was not present. The first and third attacks involved a similar progression where Labrum became upset, verbally harassed Wife, and then became physically violent. Most significantly, each of these incidents involved Wife attempting to break contact with Labrum by leaving the room but Labrum escalating the altercations by following Wife.[12] When viewed in the context of the purpose for which this other acts evidence was offered, these similarities are particularly probative. *See Verde,* 2012 UT 60, ¶ 18, 296 P.3d 673. The evidence supports Wife's testimony that she took her keys to bed for fear that Labrum would continue to escalate the situation to the point of violence, despite her attempt to disengage.

¶ 35 Furthermore, as Labrum concedes, these incidents happened close in time to the charged conduct. The first incident occurred only eight months before the March 6, 2011 attack, the second incident occurred less than one month before the March 6, 2011 attack, and the third incident occurred a week and a half before the March 6, 2011 attack. The three incidents established the pattern of Labrum's violent episodes and suggested that they were becoming more frequent. As a result, they explain Wife's fear of Labrum on the day of the charged conduct and her state of mind when she armed herself with the keys. *Cf. State v. Marchet,* 2009 UT App 262, ¶¶ 45, 52, 219 P.3d 75 (holding that the trial court acted within its discretion when it

concluded that an incident that occurred more than two years after the charged conduct "was sufficiently proximate to warrant its admission"); *State v. Northcutt,* 2008 UT App 357, ¶ 13, 195 P.3d 499 (holding that an incident that occurred twenty months before the charged conduct was not too remote in time to be probative). In turn, Wife's state of mind was pivotal to the jury's assessment of Labrum's self-defense claim.

¶ 36 In considering the improper inferences that the jury might draw from the other acts evidence, we acknowledge the sensitive nature of evidence regarding domestic violence. *See United States v. Covington,* 565 F.3d 1336, 1342 (11th Cir.2009) ("Obviously domestic violence, when irrelevant to the charge at hand, has great potential to incite unfair prejudice." (citation and internal quotation marks omitted)). Here, the jury might improperly infer from the prior incidents of domestic violence that Labrum is a person of bad character—specifically, a wife-beater—and that he acted in conformity with that bad character on the night of the charged conduct. *See generally State v. Verde,* 2012 UT 60, ¶ 15, 296 P.3d 673 ("So long as the evidence is not aimed at suggesting action in conformity with bad character, it is admissible under rule 404(b)."). Labrum contends that this tendency toward an improper inference was increased because the prior incidents of domestic violence included conduct more severe than the charged conduct, such as Labrum's threats to kill Wife, her family, and—if Wife involved them in the disputes—the police. Although the threats were more severe than the charged conduct, each prior act of physical violence that Wife described Labrum as having actually engaged in was similar in degree to the charged conduct. The testimony that Labrum pushed Wife down the stairs and walked on her, cut her face with his fingernail, and strangled and pushed her into the wall, ran no greater risk of creating hostility toward Labrum as a person of bad character than the evidence presented to support the current charge that Labrum repeatedly beat

---

**12.** According to Wife's version of events, she was leaving the house during the second incident. While this fact may indicate that the second

incident fits the same pattern as the other incidents, Wife provided insufficient detail of that episode to make that determination.

Wife in the face with his fists and a full Gatorade bottle. As our supreme court has explained,

> Such evidence of multiple acts of similar or identical abuse is unlikely to prejudice a jury; jurors will either believe or disbelieve the testimony based on the witness's credibility, not whether the witness asserts an act occurred three times or six. This evidence simply does not have the prejudicial effect that may result from introduction of prior criminal acts committed against a number of unrelated victims....

*State v. Reed,* 2000 UT 68, ¶ 31, 8 P.3d 1025; *see also State v. Balfour,* 2008 UT App 410, ¶ 26, 198 P.3d 471 (concluding that evidence of multiple acts of similar or identical abuse is unlikely to unfairly prejudice a jury).

¶ 37 Furthermore, our review of the record establishes that the State did not use the other acts evidence for any impermissible purpose or suggest to the jury that Labrum acted in conformity with his prior conduct. The prosecutor introduced the evidence in her opening statement by saying that Wife took her keys to bed because three prior arguments had ended in violence and that Wife had those prior incidents "in mind" when she went to sleep holding her keys. Aside from one brief statement pointing out what the prosecutor perceived to be evidence of credibility issues in Labrum's testimony, the prosecutor did not refer to the other acts evidence during closing argument. Likewise, before the State elicited Wife's testimony regarding the prior incidents, the trial court gave a limiting instruction to the jurors, informing them that they were to use the evidence only in determining whether, on March 6, 2011, Labrum acted intentionally and not in self-defense. The trial court expressly admonished the jurors not to consider the other acts as evidence that Labrum was "a person of bad character" and reminded them that Labrum was on trial only for the incident that occurred on March 6, 2011. *See generally Verde,* 2012 UT 60, ¶ 18, 296 P.3d 673 (noting that implicit in the trial

court's balancing under rule 403 is the consideration of whether the "tendency to sustain a proper inference [from the other acts evidence] is outweighed by its propensity for an improper inference or for jury confusion about its real purpose").

¶ 38 The trial court thoroughly examined the other acts evidence in the context of the purpose for which it was offered and carefully weighed its tendency toward proper and improper inferences. In addition, the court took reasonable measures to minimize the risk that the jury would use the evidence for an improper character purpose, and the State did not attempt to overcome those precautions by inappropriate argument. Accordingly, we conclude that the trial court did not exceed its discretion in admitting the other acts evidence under rule 404(b).

## II.  Sufficiency of the Evidence

¶ 39 Labrum contends that the evidence presented at trial was insufficient to support the jury's determination that Wife suffered "substantial bodily injury." *See* Utah Code Ann. § 76–5–102(3)(a) (LexisNexis 2012) (providing for the enhancement of assault to a class A misdemeanor if "the person causes substantial bodily injury to another"). "Substantial bodily injury" is defined as "bodily injury, not amounting to serious bodily injury, that creates or causes protracted physical pain, temporary disfigurement, or temporary loss or impairment of the function of any bodily member or organ." [13]  *Id.* § 76–1–601(12). Here, the jury was properly instructed about the legal elements of assault, the statutory definitions of the terms "bodily injury" and "substantial bodily injury," and the burden of proof required to determine the level of injury caused.

¶ 40 In support of his argument that Wife did not suffer "substantial bodily injury," Labrum cites to Minnesota case law holding that a black eye does not equate to "substantial bodily harm." *See State v. Whaley,* 389 N.W.2d 919, 926 (Minn.Ct.App.1986) (noting

---

**13.** "Bodily injury" is defined as "physical pain, illness, or any impairment of physical condition." Utah Code Ann. § 76–1–601(3) (LexisNexis 2012). "Serious bodily injury" is defined as "bodily injury that creates or causes serious permanent disfigurement, protracted loss or impairment of the function of any bodily member or organ, or creates a substantial risk of death." *Id.* § 76–1–601(11).

that "a black eye, in and of itself, does not equate to 'substantial bodily harm'" under Minnesota law (citing Minn.Stat. § 609.02(7a))). However, Minnesota's statutory definition of "substantial bodily harm" is materially different from Utah's definition of "substantial bodily injury." Utah's definition of "substantial bodily injury" may be broad enough to encompass swelling and bruising that amounts to a "temporary disfigurement," *see* Utah Code Ann. § 76–1–601(12), rather than the "temporary but *substantial* disfigurement" required under Minnesota law, *see* Minn.Stat. § 609.02(7a) (2012) (emphasis added). Furthermore, Utah's definition also encompasses "protracted physical pain," *see* Utah Code Ann. § 76–1–601(12), while Minnesota's statutory definition provides no such equivalent, *see* Minn.Stat. § 609.02(7a). Consequently, we reject Labrum's argument that Utah law requires such a narrow reading of "substantial bodily injury." Furthermore, the jury could have concluded from the evidence in this case that Labrum inflicted injuries that went substantially beyond "a black eye, in and of itself." *See Whaley*, 389 N.W.2d at 926.

¶ 41 Wife testified that the bruising and swelling to her face lasted over two weeks, that she could not keep her eyes open for a long period of time, and that she had to periodically apply ice to her injuries in order to see out of both eyes. Wife also indicated that her injuries were serious enough that they prevented her from performing her job as a second-grade teacher, both because of the magnitude of the swelling and bruising and her concern that her disfigurement might frighten her students. Furthermore, the State introduced twelve photographs showing the progression of Wife's injuries from immediately after the attack, one day after the attack, and two days after the attack, which documented the extensive injury to both eyes and much of her face.

¶ 42 There was sufficient evidence from which the jury could conclude that Labrum committed an assault that resulted in substantial bodily injury. Although Wife's injuries conceivably could have amounted to bodily injury rather than substantial bodily injury, reasonable minds could also conclude

that the bruising and swelling around Wife's eyes and face, which lasted over two weeks and prevented her from opening her eyes for long periods of time, amounted to "temporary disfigurement," or that Wife suffered "protracted physical pain" as a result of her injuries. *See* Utah Code Ann. § 76–1–601(12); *cf. State v. White*, 2011 UT App 162, ¶ 11, 258 P.3d 594 (concluding that "a 'small' facial laceration that bled significantly, continued to bleed for up to thirty minutes, and left a two to three inch scar visible at trial five months later" established sufficient evidence for the jury to find substantial bodily injury).

## CONCLUSION

¶ 43 The trial court did not exceed its discretion in admitting the evidence of other uncharged acts. Furthermore, the evidence presented at trial was sufficient to support the jury's determination that Labrum caused substantial bodily injury. Consequently, we affirm Labrum's conviction.