2000 UT 59

**STATE of Utah, Plaintiff and Appellee,**

v.

**Stacey Lamar NELSON–WAGGONER, Defendant and Appellant.**

No. 980263.

Supreme Court of Utah.

July 11, 2000.

369.2(5)

Jan Graham, Att'y Gen., Thomas B. Brunker, Asst. Att'y Gen., Salt Lake City, and Don Linton, Logan, for plaintiff.

Bel–Ami de Montreux, Kenneth R. Brown, Salt Lake City, and Shannon R. Demler, Logan, for defendant.

WILKINS, Justice:

¶ 1 Defendant Stacey Lamar Nelson–Waggoner appeals his conviction of rape, a first degree felony, on the ground that the trial court erred in admitting evidence of rapes he allegedly committed on other occasions with other victims. We affirm.

## BACKGROUND

¶ 2 On March 24, 1997, defendant was charged with five counts of rape with five different victims, each occurring in Cache County between December 1996 and February 1997. On defendant's motion, the trial court ordered separate trials on each count.

¶ 3 Before the first trial, for the alleged rape of K.M., the State moved to admit evidence of defendant's prior crimes, wrongs, or acts under Utah Rule of Evidence 404(b).[1] Specifically, the State wanted defendant's other accusers to testify to the similar circumstances of their alleged rapes in order to establish defendant's modus operandi, motive, preparation, intent, knowledge, and lack of mistake or accident, as well as to show K.M.'s lack of consent. In each of the five rapes charged, defendant allegedly (1) invited the victim to his dorm room at Utah State University (USU) on a pretense; (2) wore loose-fitting clothing that could easily be removed quickly; (3) locked the door to his dorm room before the alleged rape; (4) asked the victim to kiss his body before raping her; (5) committed the rape in that room; (6) penetrated the victim after forcing her legs over his shoulders, bending her body in half so her knees were near her head in a confining position that hurt and made it diffi-

---

1. At the time of the trial of the first rape count, rule 404(b) provided:

 *Other crimes, wrongs, or acts.* Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

 Utah R. Evid. 404(b) (1997).

cult for her to breathe or cry out for help; (7) told the victim to "enjoy the moment" or to stop crying and protesting because she was "ruining a beautiful thing"; and (8) told the victim that nothing had happened or would happen in the future and that everything was all right. In three of the five alleged rapes, (9) the victims were offered money. In four of the alleged rapes, (10) defendant increased the volume on his television or stereo system before the encounter. All five of the alleged rapes occurred within a ten-week period.

¶ 4 The State argued that this evidence was not barred under rule 404(b) as construed in *State v. Doporto*, 935 P.2d 484 (Utah 1997), *superseded by* Utah R. Evid. 404(b) (as amended February 11, 1998), the law in effect at the time of trial. The trial court agreed that the circumstances of defendant's other alleged rapes were similar enough to "constitute a signature," a proper, noncharacter purpose under rule 404(b). However, the court also decided that under *Doporto*'s construction and application of rule 403 of the Utah Rules of Evidence to cases involving rule 404(b) evidence, the evidence was inadmissible in the State's case-in-chief because it was more prejudicial than probative. The court further stated that other proof of the crime was available, such as the victim's testimony. The jury did not hear the evidence of other "crimes, wrongs or acts" and acquitted defendant on the first charge of rape.

¶ 5 The second trial resulted in defendant's conviction for the rape of E.G. and leads to this appeal. Prior to the second trial, rule 404(b) was amended to overrule the additional requirements imposed by *Doporto* for admitting evidence under rule 404(b)[2] and to clarify that evidence of other crimes, wrongs, or acts must also meet the admissibility requirements of rules 402 and 403 of the Utah Rules of Evidence.[3] *See* Utah R. Evid. 404(b) (as amended February 11, 1998); Utah R. Evid. 404 advisory committee's note. Again the State moved to admit evidence of the other alleged rapes committed by defendant to show defendant's lack of credibility, modus operandi, motive, plan, intent, and lack of mistake and to establish E.G.'s lack of consent, a pivotal element of the crime charged. This time the trial court applied the amended version of rule 404(b) rather than the *Doporto* analysis, which it had done in the first trial. In so doing, the court held that it would allow evidence in the second trial of the alleged rapes of K.M. and K.T. to show defendant's modus operandi and ultimately to show that the sexual encounter was not consensual, so long as each victim's testimony met six of the ten factual similarities described above in paragraph three.

¶ 6 The trial of the second rape count involved two sexual encounters between defendant and E.G., another USU student. In their opening statements, both the State and the defense said that K.M., the first rape trial victim, and K.T., a victim in another rape count, would discuss the circumstances surrounding their alleged rapes. The State emphasized that this "bad acts" evidence would be presented "to show a method, a scheme, a plan that the defendant used to commit this crime," not to show that defendant had a propensity to commit rape. Defendant's attorney emphasized in his opening statement that defendant had been acquitted of the incident to which K.M. would testify, that the incident to which K.T. would testify had not yet been tried, and that the only issue in the instant trial was whether E.G., not K.M. or K.T., was raped.

¶ 7 At trial, E.G. testified that at the time of the alleged rape she was a nineteen-year-

**2.** *Doporto* held that to

assure the integrity of the trial process, ... evidence of prior crimes is presumed to be inadmissible and that, prior to admitting it, the trial court must find that (1) there is a necessity for the prior crime evidence, (2) it is highly probative of a material issue of the crime charged, and (3) its special probativeness and the necessity for it outweigh its prejudicial effect.

*State v. Doporto*, 935 P.2d 484, 490 (Utah 1997), *superseded by* Utah R. Evid. 404(b) (as amended February 11, 1998).

**3.** The February 11, 1998 amendment added the following line to the end of rule 404(b): "In other words, evidence offered under this rule is admissible if it is relevant for a non-character purpose and meets the requirements of Rules 402 and 403." Utah R. Evid. 404(b) (1998).

old university student. On the day she met defendant in December 1996, he invited her to his dorm room to see pictures of his children. After showing her the pictures, defendant went to his door, turned off the light, and then kissed her. She stated: "[T]he next thing I know I was on his bed and he was trying to take off my shirt. I froze up. My hands froze, kind of like a tingling sensation in my whole body. I had been laid down on the bed. . . ." E.G. testified that after he removed her pants, defendant put her legs over his shoulders and then forced his body on top of her with her legs above her head, her knees by her forehead. E.G. said that she could not feel her body: it tingled, as if it had fallen asleep, and her hands were frozen closed. She was unsure whether defendant actually penetrated her in this encounter. E.G. testified that she was very confused and was unsure about what had happened or if she was at fault. After returning home, E.G. bathed for several hours.

¶ 8 E.G. further testified that late on December 18 or early on December 19, hours before she was to fly home out of state, defendant called her and requested that she come to his dorm room to receive a Christmas present. When she arrived, defendant shut and locked the door behind her and gave her a Christmas tree ornament, a box of chocolates, and an envelope containing a condom that she was told not to open until she was on the plane home. After turning on his radio, defendant turned off the lights and asked her to sit next to him. She sat elsewhere, and the two had a brief conversation. She testified that defendant sat down next to her, began to kiss her, and tried to take off her shirt. She told defendant to stop, but he said, "You can't leave me like this." He stood up, pushed his loose fitting athletic shorts to his knees, grabbed her head, and told her to kiss his body. E.G. testified that she did not understand what that meant but that defendant explained it meant she should give him oral sex. E.G. tried to pull away several times and told defendant, "[N]o, I [don't] want to." Defendant then forced E.G. to the bed and pulled her shorts down over her knees. In her words, he then "threw my legs over my head, and he raped me. I told

him no, and he told me to stop crying. I said no." E.G. testified that, in this folded position, it was hard to breathe or speak and that she repeatedly told defendant to stop. He responded that she should be quiet, that she was ruining the moment, and that this was a beautiful thing.

¶ 9 Before the other two alleged victims, K.M. and K.T., testified, the court gave the following instruction to the jury on the appropriate use of the bad acts evidence:

You are going to hear evidence of other sexual assaults allegedly committed by the defendant. You may use the evidence only to help you decide whether Stacey Nelson–Waggoner had nonconsensual sexual intercourse with [E.G.] and for no other purpose. The law does not allow you to convict the defendant or to punish him simply because you believe he may have done other things, even bad things, not specifically charged as crimes in this case. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action and conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

You are instructed that Mr. Nelson–Waggoner was previously acquitted by a jury of the offense against [K.M.]. You are further instructed that Mr. Nelson–Waggoner has not been tried for the offense alleged by [K.T.] and is presumed innocent until proven guilty.

¶ 10 K.M. then testified that she met defendant in early December 1996 while she was a student at USU. At the time, she was a nineteen-year-old music student at the university. The second time they met, defendant invited her to his room to discuss, she thought, the purchase of her stereo. Once there, defendant asked her to give him a back rub. As she did, defendant tried to kiss her, but she rejected him. He took off his loose athletic shorts and asked her to kiss his body. When she refused, he forced her head to his penis so she would give him oral sex. When she resisted, defendant laid her on the

bed, removed her pants, forced her legs over his head, pushed her legs up until she was folded with her knees by her ears, and raped her. During the rape, defendant told her to stop crying because she was "ruining a beautiful moment" for him. Sometime after the night of the rape, defendant offered her $500 to make a car payment. K.M. also testified that she and E.G. each had learned that the other had been raped and had discussed the incidents together.

¶ 11 K.T. testified next. She said that she met defendant the first week of January 1997 in class. The next day, defendant invited her to his dorm room to see pictures of his daughters. While there, they began kissing. K.T. attempted to leave, but defendant asked her to stay. They continued kissing, and defendant repeatedly tried to take off her shirt. K.T. told him she did not want to have sex with him, and defendant responded, "We don't have to have sex. We can just kiss and you can kiss my body and we can enjoy each other." K.T. again attempted to leave, and defendant held her back, eventually laying her on the bed. K.T. testified that defendant then pushed her legs up by her head: "He held my calves and kind of bended my knees up by my ears. Then he laid on me. . . . He was so heavy. My legs were hurting, my back was hurting." While K.T. cried and repeatedly resisted, defendant raped her. Defendant continued to call K.T., but she avoided him. When they did see each other again, he offered her the use of his car, a gas card, $500 spending money, dinner or concert reservations, and his gold chain if she would "pamper" him. She refused.

¶ 12 Defendant testified to events similar to those described by E.G., except in the following aspects. According to him, the first time he met E.G., she flirted with him almost immediately, kissed him first, and initiated both oral sex and intercourse. Defendant testified that E.G. had promised to purchase for him a pair of expensive tennis shoes as a Christmas present, and she called him to bring over the gift. Defendant stated he gave E.G. her present but was confused when she did not have a gift for him. According to him, E.G. gave him a "seductive"

present in which she stripped, kissed him, allowed him to fondle her, and gave him oral sex. He testified that they did not engage in intercourse at that time. Upon E.G.'s return after the Christmas break, defendant informed her that his wife was pregnant with their third child and that they were going to attempt reconciliation. Thereafter, contact between defendant and E.G. broke off.

¶ 13 Before closing arguments, the court repeated the instruction it had previously given the jury regarding the use of the bad acts evidence. Both parties discussed the bad acts evidence in closing arguments. The prosecutor stated:

> [T]he law says, and I implore you also, you cannot convict him because I think he has a propensity to commit rape. You have an instruction that says that. But you can consider . . . as a fact, the method of operation and how these rapes were committed. You can consider his knowledge and intent and what the modus operandi tells you.

Defense counsel reminded the jury that defendant had been acquitted in K.M.'s case, and that "it was unfair to go into that [evidence] and confuse you folks with that circumstance." Defense counsel also reminded the jury that defendant had not yet been tried for K.T.'s alleged rape and that the only issue in the instant case was whether defendant raped E.G., not whether defendant raped K.M. or K.T.

¶ 14 The jury found defendant guilty of raping E.G., and this appeal followed.

## ISSUE AND STANDARD OF REVIEW

¶ 15 Defendant's sole argument on appeal is that the trial court committed reversible error by admitting evidence of other rapes allegedly committed by defendant against other alleged victims.

¶ 16 In *State v. Decorso,* 1999 UT 57, ¶ 18, 993 P.2d 837, *cert. denied,* —— U.S. ——, 120 S.Ct. 1181, 145 L.Ed.2d 1088 (2000), we reconfirmed that we review a trial court's decision to admit evidence under rule 404(b) of the Utah Rules of Evidence under an abuse of discretion standard.[4] We review the rec-

---

4. We repeat our recent note in *Rivera v. State* *Farm Mutual Automobile Insurance Co.:*

ord to determine whether the admission of other bad acts evidence was "scrupulously examined" by the trial judge "in the proper exercise of that discretion." *Id.*[5]

## ANALYSIS

¶ 17 Rule 404(b) governs the admissibility of bad acts evidence. It provides as follows:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In other words, evidence offered under this rule is admissible if it is relevant for a non-character purpose and meets the requirements of Rules 402 and 403.

Utah R. Evid. 404(b) (1998).[6]

■ ¶ 18 In determining whether bad acts evidence is admissible, the trial court must first determine whether the bad acts evidence is being offered for a proper, noncharacter purpose, such as one of those specifically listed in rule 404(b). *See Decorso,* 1999 UT 57 at ¶ 21, 993 P.2d 837. If the court resolves that the evidence is being offered for such a purpose, it proceeds with the remainder of the analysis as discussed below. *See id.* "However, if the court determines that the evidence is being offered only to show the defendant's propensity to commit crime, then it is inadmissible and must be excluded at that point." *Id.*

¶ 19 Second, the court must determine whether the bad acts evidence meets the requirements of rule 402, which permits admission of only relevant evidence. *See* Utah R. Evid. 402; *Decorso,* 1999 UT 57 at ¶ 22, 993 P.2d 837. Rule 401 of the Utah Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." "[U]nless the other crimes[, wrongs, or bad acts] evidence tends to prove some fact that is material to the crime charged—other than the defendant's propensity to commit crime—it is irrelevant and should be excluded by the court pursuant to rule 402." *Decorso,* 1999 UT 57 at ¶ 22, 993 P.2d 837; *accord State v. Forsyth,* 641 P.2d 1172, 1176–77 (Utah 1982) (indicating that evidence is not admitted merely because it shows a common plan, scheme, manner of operation, or the like but that evidence of noncharacter purpose is admissible where it tends to prove some fact material to the crime charged).

¶ 20 Finally, the trial court must determine whether the bad acts evidence meets the requirements of rule 403 of the Utah Rules of Evidence. That rule provides:

> "abuse of discretion" interchangeably, meaning to describe exactly the same condition. 2000 UT 36, ¶ 7 n. 2, 1 P.3d 539.

The phrase "abuse of discretion" has come into common usage in review of judicial proceedings. Although it is seen by appellate courts as an efficient way of describing a more complex concept, it has also come to be seen by many as offensive. The phrase is used here simply to be consistent with prior case law regarding the standard of review to be applied to the trial court's actions. When a trial court abuses its discretion, it has exceeded the range of discretion allowed for the particular act under review. When it does not abuse its discretion, it has stayed within the permitted range of discretion allowed. Use of the phrase "abuse of discretion" should not be misread to imply a conscious and intentional violation of the permitted discretion by the trial judge. Although such a willful disregard of the standards to be applied by the trial judge happens occasionally, it is certainly not the rule, and our use of "abuse" of discretion should not be read to imply such wrongful intent. We use "exceed the permitted range of discretion" and

5. Although defendant urges us to examine the trial court's decision "closely" and grant it "limited deference" as we have done in the past, *see State v. Doporto,* 935 P.2d 484, 489–90 (Utah 1997), *superseded by* Utah R. Evid. 404(b) (as amended February 11, 1998); *State v. Pearson,* 943 P.2d 1347, 1351 (Utah 1997), we have recently announced that we will no longer do so, *see State v. Decorso,* 1999 UT 57, ¶¶ 14–18, 993 P.2d 837, *cert. denied,* —— U.S. ——, 120 S.Ct. 1181, 145 L.Ed.2d 1088 (2000).

6. We apply rule 404(b) as it existed at the time of the second trial, the amended version of rule 404(b). *See* Utah R. Evid. 404(b) (as amended February 11, 1998); *Decorso,* 1999 UT 57 at ¶ 26, 993 P.2d 837 (applying rule 404(b) as it existed at time of trial, which was pre-*Doporto* law).

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Utah R. Evid. 403. In determining whether the bad acts or other crimes evidence meets rule 403's requirements,

"a variety of matters must be considered, including the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility."

*Decorso*, 1999 UT 57 at ¶ 29, 993 P.2d 837 (quoting *State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988)) (additional citations omitted).

## I. RULE 404(b) ANALYSIS

### A. *Noncharacter Purpose*

■ ¶ 21 We next turn to the application of rule 404(b) to the instant case. We first examine whether the evidence was offered for a proper, noncharacter purpose.

¶ 22 The State offered the evidence of the other alleged rapes for the following noncharacter, nonpropensity purposes: to show (1) that defendant intended to rape E.G.; (2) that he had a set plan or scheme and specific modus operandi; and (3) that the sexual encounter was not a mistake or an accident (defendant knew what he was doing). Any one of these is a valid, noncharacter purpose to admit the evidence. In addition, the question of whether E.G. consented to sexual intercourse with defendant was the central issue of the case. Defendant conceded that he had sexual relations with E.G on one occasion. His defense was that their encounter was not rape because E.G. was the initiator and consented to having sexual intercourse.

¶ 23 In conducting a scrupulous examination of this evidence, the trial court determined that the other victims could testify to the circumstances of the other alleged rapes

only if the prosecution could demonstrate that each rape about which testimony would be offered included at least six of the ten characteristics listed. The trial court listed the ten factual characteristics mentioned above in paragraph three that were common to the other rapes defendant allegedly committed. The court considered several of these characteristics to be indicative of nonconsensual sex and others neutral on that issue, depending on the context of the event. The trial court considered the victims' physical position during the alleged rapes as "the most significant" indicator of a lack of consent because, the court explained, the victims were describing a condition in which they were "folded essentially in half in an extremely uncomfortable position, making it difficult for the victim to breathe or resist or escap[e]." Based on its examination of the proposed evidence, the trial court instructed the jury that it could consider the evidence in deciding whether E.G. consented to having sexual intercourse with defendant.

¶ 24 Traditionally, evidence that a defendant raped others has been viewed solely as impermissible character evidence and has not been considered probative of whether a current victim was raped. *See, e.g., Lovely v. United States*, 169 F.2d 386, 390 (4th Cir. 1948). More recently, however, bad acts evidence has been admitted for the noncharacter purpose of proving the element of lack of consent in certain rape trials. *See* Annotation, Timothy E. Travers, *Admissibility, in Rape Case, of Evidence that Accused Raped or Attempted to Rape Person Other than Prosecutrix*, 2 A.L.R.4th 330, § 6(a) (1980 & Supp.1999). This is especially true when a defendant allegedly obviates the victim's consent in a strikingly similar manner in several alleged rapes. *See State v. Hill*, 104 Ariz. 238, 450 P.2d 696, 697 (1969); *People v. Gray*, 259 Cal.App.2d 846, 66 Cal.Rptr. 654, 656–57 (1968). Courts allowing bad acts evidence in such cases realize that the evidence "is not conclusive proof that the [victim] did not consent." *People v. Oliphant*, 399 Mich. 472, 250 N.W.2d 443, 450 (1976). However, such evidence "is both relevant and material to the issue of consent and therefore properly admissible." *Id.*

¶ 25 In this case, the testimonies of K.T. and K.M. laid out a pattern of behavior in which defendant engaged that was consistent with the pattern of behavior in which he engaged with E.G. The details of this pattern of behavior and the consistency of it suggest that E.G. did not consent to sexual intercourse with defendant. E.G. testified that defendant forced her legs over his shoulders as he lay upon her, pushing her knees up near her ears, therefore folding her nearly in half, and that this position was painful and made it difficult for her to breathe, speak, or cry out. K.T. and K.M. testified that defendant forced them into the same painful position. That defendant imposed this position on the women by force suggests the women did not consent to being in this position. It further suggests that the women did not consent to defendant's pattern of behavior—including intercourse—while he held them in this position. That defendant engaged in this distinctive behavior with both E.G. and the two witnesses, K.T. and K.M., makes this evidence probative as to the issue of consent. Therefore, the trial court did not exceed its permitted range of discretion in finding that the evidence was offered for a proper, non-character purpose.

### B. Rule 402 Analysis

■ ¶ 26 Bad acts evidence, like all evidence, must be relevant or it is inadmissible. *See* Utah R. Evid. 402. Rule 404(b) now specifically declares that it is subject to rule 402, which states: "All relevant evidence is admissible, except as otherwise provided.... Evidence which is not relevant is not admissible." *Id.* Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R. Evid. 401. Additionally, under this court's well-established case law, "unless the other

crimes evidence tends to prove some fact that is material to the crime charged—other than the defendant's propensity to commit crime—it is irrelevant and should be excluded by the court pursuant to rule 402." *State v. Decorso*, 1999 UT 57, ¶ 22, 993 P.2d 837, *cert. denied*, —— U.S. ——, 120 S.Ct. 1181, 145 L.Ed.2d 1088 (2000).

■ ¶ 27 In this case, as discussed above, evidence of defendant's bad acts was relevant to whether the alleged victim consented to having sexual intercourse with defendant. Consent is one of the two elements of rape, *see* Utah Code Ann. § 76–5–402(1) (1999),[7] and is material to the crime charged, *see People v. McKibben*, 862 P.2d 991, 993 (Colo. Ct.App.1993); *Oliphant*, 250 N.W.2d at 449. Additionally, in this case, it was the *only* issue at trial, since defendant admitted to having sexual intercourse with E.G. on one occasion. While the bad acts evidence did not conclusively prove defendant raped E.G. by having sexual intercourse with her without her consent, the evidence made "the existence of [that material, consequential] fact ... more probable ... than it would be without the evidence." Utah R. Evid. 401. Therefore, the evidence was relevant under rule 402.

### C. Rule 403 Analysis

■ ¶ 28 Finally, we examine whether the trial court acted within its discretion in determining that the bad acts evidence met the requirements of rule 403.[8] In other words, we must determine whether the trial court abused its discretion by ruling that the probative value of K.M.'s and K.T.'s testimonies was not substantially outweighed by the danger of unfair prejudice. As we discussed above, this court in *Decorso* considered the *Shickles* factors in making this determination. *See Decorso*, 1999 UT 57 at ¶ 29, 993

---

7. Section 76–5–402 provides:
 (1) A person commits rape when the actor has sexual intercourse with another person without the victim's consent.
 (2) This section applies whether or not the actor is married to the victim.
 (3) Rape is a felony of the first degree.

Utah Code Ann. § 76–5–402 (1999).

8. While the trial court did not make a specific finding that evidence of the other rapes was admissible under rule 403, that inference follows from the fact that it ruled the evidence admissible in the second trial.

P.2d 837.[9] We also apply the *Shickles* factors to the facts of this case to make this determination.

¶ 29 The *Shickles* factors that seem particularly important here are "the similarities between the crimes" and "the interval of time that has elapsed between the crimes." *Shickles*, 760 P.2d at 295–96. First, as discussed in detail above, there were significant and striking similarities in the manner in which defendant carried out E.G.'s rape and the manner in which he allegedly carried out the other rapes. Second, the time between all of the incidents was a brief ten weeks. *See Decorso*, 1999 UT 57 at ¶ 32, 993 P.2d 837 (calling seven-month interval "relatively short"). The combination of these two factors makes the bad acts evidence in this case highly probative. As one court stated, "[P]roximity in time combined with similarity in type of crime virtually guarantees admittance of prior bad acts evidence." *United States v. Drew*, 894 F.2d 965, 970 (8th Cir. 1990). The probative value of the combination of these two factors is highlighted in *People v. Oliphant*, 399 Mich. 472, 250 N.W.2d 443, 445–49 (1976), where evidence of three separate alleged rapes, similar in method and occurring within a period of five months, was found admissible in another rape trial.

¶ 30 Most of the other *Shickles* factors also show that the probative value of the bad acts evidence is not substantially outweighed by the danger of unfair prejudice in this case. The need for the bad acts evidence was great; without it, the trial resolved into a contest of credibility between defendant and E.G. In addition, no alternative evidence regarding consent existed other than E.G.'s and defendant's directly conflicting testimonies. Furthermore, the bad acts evidence in this case was not the type of evidence that would arouse the jury to "overmastering hostility."

¶ 31 Defendant makes the valid argument that K.M.'s bad acts testimony was suspect because defendant had already been acquitted of the alleged rape to which she testified and because she and E.G. had discussed their rapes before reporting them and testifying. However, because the other *Shickles* factors firmly establish that the probative value of the bad acts evidence in this case is not substantially outweighed by the danger of unfair prejudice, the fact that there are deficiencies in that evidence does not make it inadmissible. These weaknesses were discussed during trial. The jury was aware of them and presumably took them into account when weighing the evidence. Therefore, the bad acts evidence was admissible under rule 403.

## CONCLUSION

¶ 32 The trial court did not abuse its discretion in admitting the bad acts evidence in this case. It was offered for a proper, non-character purpose, it was relevant, and its probative value was not substantially outweighed by the danger of unfair prejudice. Defendant's conviction is affirmed.

¶ 33 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURHAM, and Justice DURRANT concur in Justice WILKINS' opinion.

---

9. The factors *Shickles* recommends a court examine in determining the admissibility of evidence under rule 404(b) include the following: the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility. *State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988).