**2015 UT App 180**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Plaintiff and Appellee,
*v.*
JOHN MARCUS LOWTHER,
Defendant and Appellant.

Opinion
No. 20130697-CA
Filed July 30, 2015

Third District Court, Salt Lake Department
The Honorable Randall N. Skanchy
No. 111900725

Edward J. Stone, Attorney for Appellant

Sean D. Reyes and Tera J. Peterson, Attorneys
for Appellee

JUDGE JAMES Z. DAVIS authored this Opinion, in which
JUDGE JOHN A. PEARCE concurred. JUDGE GREGORY K. ORME
dissented.

DAVIS, Judge:

¶1     John Marcus Lowther entered conditional no-contest pleas to two counts of rape, reserving for appeal his challenge to the trial court's grant of the State's motion to admit evidence pursuant to rule 404(b) of the Utah Rules of Evidence. We reverse and remand.

BACKGROUND

¶2     In support of its charge that Lowther raped K.S., the State sought to admit testimony from three other women who allege that Lowther had "raped them under similar circumstances: they

had attended a social gathering where they consumed alcohol; they went to sleep either drunk or tipsy; and they awakened to find [Lowther] forcefully penetrating them." The State considered the evidence necessary to show Lowther's "intent to engage in sexual activity without the consent of the victims," his "modus operandi . . . to initiate the offenses after the victims had reached a state where they were incapable of protesting or resisting," and his "lack of accident or mistake" as to the "vulnerability of his victims at the time that he perpetrated sexual offenses against them," and to establish lack of consent. The trial court held an evidentiary hearing during which K.S. and the three proposed witnesses testified.

¶3    K.S. testified that she attended a movie premiere on September 22, 2010, when she was twenty years old. She testified that because she had been drinking at the event and later at a hotel bar, she called a friend to drive her and another woman, S.H., home from the premiere. The friend arrived in a car driven by Lowther, whom K.S. had met a few times on previous occasions. Lowther drove K.S. and S.H. to S.H.'s house. K.S. testified that she probably had two drinks that night at the event. She estimated that at the time she went to bed her level of intoxication was a two on a ten-point scale on which zero was completely sober and ten was having alcohol poisoning. K.S. went straight to bed in S.H.'s room, removing her jeans herself, and later woke up to find Lowther laying behind her, in a spooning position, penetrating her vaginally. Her underwear was pushed aside. He also had an arm draped over her torso and was holding her wrist against her chest. K.S. rolled away. Lowther either pulled her back to the bed or she fell back. K.S. stood up again and left the room, ending the incident.

¶4    A.P. testified that she had met Lowther a few times through a friend before seeing him at a house party in December 2009. A.P. testified that she drank vodka at the party, that she had never been drunk before, and that she was seventeen at the time. She testified that she became very sick from the alcohol

and that her then-boyfriend brought her to a quiet room in the basement of the house where she could rest. She testified that her intoxication was "a 7 or 8, possibly a 9" on a ten-point scale with "10 being ending up in the hospital with alcohol poisoning." A.P.'s boyfriend and several other people continued to periodically check on A.P. while she was in the basement room. At some point, Lowther came into the room, purportedly to check if A.P. was okay, at which time he began "rubbing" her and "dry humping" her. She testified that Lowther had shut and locked the door and that she could occasionally hear her boyfriend and friends trying to get in to the room to check on her but that she was too intoxicated to respond. She testified that she told Lowther "no" at least twice while he was rubbing and humping her but that she then "blacked out," and when she regained consciousness, "[Lowther] was on top of [her] . . . , his penis was inside of [her]," and he had pinned her hands alongside her torso. She testified that Lowther had pulled her pants down to her ankles but that she probably still had a shirt on. She testified that she told Lowther "no" another two or three times and repeated that she was sick, and she recalled "throwing up continuously through this the whole time." She testified that she blacked out again and that when she "woke up[, Lowther] was next to [her]." That was when she got up and left.

¶5    C.H., who was eighteen at the time of her alleged rape, testified that she had invited some friends to her apartment on February 14, 2009, and that one of her guests brought Lowther to the party. C.H. testified that she had never met Lowther before. She testified that she consumed alcohol at the party, in Lowther's presence, and that she proceeded to get "very intoxicated." During the party, C.H. fought with her then-boyfriend and kicked him out of the apartment. She testified that she talked with Lowther and other partygoers about the fight. Around 5:00 a.m., C.H. told Lowther and the other remaining guests that she was going to bed. Approximately an hour and a half after she fell asleep, C.H. woke up because Lowther was on

top of her, having sex with her. Her pants had been removed, she presumed by Lowther. She testified, "I actually asked him what was happening. I didn't get it," and when she realized what was occurring, she "started pushing him from his shoulders to get him off." When that did not work after several attempts, she "pushed him by his . . . pelvis area," which ultimately caused him to stop. She also testified that she did not feel intoxicated at the time of the alleged sexual conduct.

¶6    Last, C.R. described herself as "pretty good friends" with Lowther, whom she got to know through her then-boyfriend, now husband. On July 20, 2010, when C.R. was twenty years old, she and her boyfriend invited Lowther to their house for some drinks. She and Lowther both drank that night. She testified that she had three or four shots of vodka throughout the evening, and she estimated her intoxication level as a four, five, or six out of ten. C.R. went to bed and later woke up because she felt "fingers inside" of her and Lowther laying across her legs. Her boyfriend was asleep in the bed next to her. She testified that she "sort of shifted a little bit, kicked [Lowther] off," and told him to go home, at which point he left.

¶7    Following the evidentiary hearing, the trial court issued a memorandum decision and order granting the State's motion to admit the rule 404(b) evidence. The court based its ruling on the doctrine of chances and our supreme court's decision in *State v. Verde*, 2012 UT 60, 296 P.3d 673. Lowther appeals.

ISSUE AND STANDARD OF REVIEW

¶8    On appeal, Lowther argues that the trial court did not "engage in a scrupulous examination" of the prior bad acts evidence because it failed to follow the requisite rule 404(b) analysis and instead relied solely on the doctrine of chances. Rule 404 of the Utah Rules of Evidence provides, "Evidence of a crime, wrong, or other act is not admissible to prove a person's

character in order to show that on a particular occasion the person acted in conformity with the character." Utah R. Evid. 404(b)(1). However, evidence of a prior bad act "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2). "[W]e review a trial court's decision to admit evidence under rule 404(b) . . . under an abuse of discretion standard. We review the record to determine whether the admission of other bad acts evidence was 'scrupulously examined' by the trial judge 'in the proper exercise of that discretion.'" *State v. Nelson-Waggoner*, 2000 UT 59, ¶ 16, 6 P.3d 1120 (footnote omitted) (quoting *State v. Decorso,* 1999 UT 57, ¶ 18, 993 P.2d 837). Thus, we accord some deference to a trial court's decision to admit evidence under rule 404(b), "[b]ut such a decision can withstand our review only if the evidence falls within the bounds marked by the legal standards set forth in the rules of evidence." *Verde,* 2012 UT 60, ¶ 19.

## ANALYSIS

¶9　　In reviewing a motion to admit prior bad acts under rule 404(b), a trial court must make three inquiries. A "trial court must first determine whether the bad acts evidence is being offered for a proper, noncharacter purpose, such as one of those specifically listed in rule 404(b)." *Nelson-Waggoner*, 2000 UT 59, ¶ 18. Next, "the court must determine whether the bad acts evidence meets the requirements of rule 402 [of the Utah Rules of Evidence], which permits admission of only relevant evidence." *Id.* ¶ 19. The doctrine of chances "is a theory of logical relevance that rests on the objective improbability of the same rare misfortune befalling one individual over and over," *Verde,* 2012 UT 60, ¶ 47 (citation and internal quotation marks omitted), and therefore, the doctrine may satisfy either or both of these first two rule 404(b) inquiries. Last, in determining whether prior bad acts evidence should be admitted, a "trial court must

determine whether the bad acts evidence meets the requirements of rule 403 of the Utah Rules of Evidence," which provides that relevant evidence "'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.'" *Nelson-Waggoner*, 2000 UT 59, ¶ 20 (quoting Utah R. Evid. 403).

## I. The Doctrine of Chances

¶10   Lowther first argues that in *Verde*, the Utah Supreme Court specifically limited the application of the doctrine of chances to cases in which the defendant challenges the complaining witness's testimony as fabricated. *See Verde*, 2012 UT 60, ¶¶ 44, 46. And because he never raised or indicated an intent to raise a defense of fabrication, Lowther contends that the doctrine of chances is inapplicable to his case and that the State's rule 404(b) evidence is not admissible under this theory.

¶11   "Fidelity to the integrity of [rule 404(b)] requires a careful evaluation of the true—and predominant—purpose of any evidence proffered under rule 404(b)." *Id*. ¶ 22. In *Verde*, the court acknowledged that "[i]n some circumstances, evidence of prior misconduct can be relevant under the so-called 'doctrine of chances.'" *Id.* ¶ 47. The court further acknowledged that the doctrine of chances "defines circumstances where prior bad acts can properly be used to rebut a charge of fabrication." *Id.* The court also explained the doctrine in terms of rebutting defenses based on mistake, coincidence, or accident. *See id*. ¶¶ 48–50 (collecting cases). Because a charge of witness fabrication was at issue in *Verde*, the *Verde* court necessarily addressed the doctrine more specifically in regard to that noncharacter purpose. *Id*. ¶¶ 44, 46. This court's subsequent applications of and citation to *Verde* may have suggested different interpretations of the scope of that case. *See, e.g., State v. Clark*, 2014 UT App 56, ¶ 23 n.4, 322 P.3d 761 (citing *Verde* and defining the doctrine of chances as a means to rebut a fabrication defense); *State v. Lomu*, 2014 UT App 41, ¶ 25, 321 P.3d 243 (citing *Verde* and affirming the use of the doctrine of chances to admit prior bad acts evidence to rebut

the defendant's claim that he did not know or intend that his accomplice would use a gun during a convenience store robbery). Nonetheless, the *Verde* court defined the doctrine of chances as a theory of relevance under which rule 404(b) "evidence of prior similar tragedies or accusations" may be admitted to support an "inference that the chance of multiple similar occurrences arising by coincidence is improbable" as well as "a conclusion that one or some of the occurrences were not accidents or false accusations." *Verde*, 2012 UT 60, ¶¶ 50–51; *see also State v. Labrum*, 2014 UT App 5, ¶¶ 31–32, 318 P.3d 1151 (citing *Verde* and describing the doctrine of chances as a general theory of relevance under which prior bad acts evidence may be admitted). Thus, we are not convinced that *Verde* necessarily limited the applicability of the doctrine of chances, as Lowther argues, to "'circumstances where prior bad acts can properly be used to rebut a charge of fabrication.'" (Quoting *Verde*, 2012 UT 60, ¶ 47.)

¶12    Although the trial court in this case identified the noncharacter purpose for which it admitted the rule 404(b) evidence as, by itself, "the doctrine of chances," the court also recognized the rule 404(b) evidence as relevant to prove lack of consent. Lowther states in his appellate brief "that the testimony from the other women would have a tendency to make the existence of K.S.'s consent [to sexual intercourse] more or less probable than it would be without said testimony." *See generally* Utah Code Ann. § 76-5-402(1) (LexisNexis Supp. 2014) ("A person commits rape when the actor has sexual intercourse with another person without the victim's consent."). Likewise, when the State addressed the doctrine of chances in support of its motion to admit the rule 404(b) evidence, it suggested that the bad acts evidence should be admitted under this framework to rebut Lowther's defense of consent. Although neither party addresses whether the doctrine of chances provides a stand-alone ground on which rule 404(b) evidence may be admitted, we are satisfied that the trial court considered the evidence for

the separate noncharacter purpose of refuting Lowther's defense of consent.

## II. Application of the Doctrine of Chances

¶13    Lowther next contends that the rule 404(b) evidence is not sufficiently similar to K.S.'s account to be admissible. Rule 404(b) evidence offered under the doctrine of chances "must not be admitted absent satisfaction of four foundational requirements, which should be considered within the context of a rule 403 balancing analysis." *State v. Verde*, 2012 UT 60, ¶ 57, 296 P.3d 673 (footnote omitted); *see also* Edward J. Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition*, 51 Ohio St. L.J. 575, 589–601 (1990) (differentiating slightly the admissibility requirements for evidence offered under the doctrine of chances based on whether the evidence is offered to prove an actus reus or a mens rea). Those four requirements center on the materiality, similarity, independence, and frequency of the charged and uncharged conduct. *Verde*, 2012 UT 60, ¶¶ 57–61.

¶14    Similarity is necessary "to dispel any realistic possibility of independent invention" between the rule 404(b) witnesses and is achieved by requiring, at the very least, that "[e]ach uncharged incident . . . be roughly similar to the charged crime." *Id.* ¶¶ 58–59 (emphasis, citations, and internal quotation marks omitted). Furthermore, when comparing the similarities between victims of uncharged incidents, generally "courts are less tolerant of dissimilarities" because "[t]he accused's intent may vary with the victim's identity." Imwinkelried, 51 Ohio St. L.J. at 596–97; *see also People v. Spoto*, 795 P.2d 1314, 1320 (Colo. 1990) (en banc) ("[S]imilarity is crucial when the theory of logical relevance is the doctrine of chances."); *State v. Leistiko*, 282 P.3d 857, 863–64 (Or. 2012) (en banc) (interpreting the doctrine of chances as requiring a high degree of similarity and suggesting that the doctrine is unavailable when the occurrence of the actus

reus is in dispute), *modified on other grounds by* 292 P.3d 522 (Or. 2012) (en banc). Accordingly, courts "should insist that the victims be similar" because "the trier [of fact] can infer wrongful intent much more confidently if the accused has victimized the same type of person on other occasions." Imwinkelried, 51 Ohio St. L.J. at 596–97.

¶15    In weighing the similarity factor, the trial court concluded, "Like the charges involving K.S., the three other alleged [incidents] were against young women with whom Mr. Lowther had little or no acquaintance, who were intoxicated and either asleep or passed out, and whom the defendant allegedly raped in private . . . ." Lowther challenges this conclusion, pointing out that "[t]here is no pattern among the women in the amount of alcohol consumed, only that alcohol itself was consumed, with varying effects"; that the degree to which the women had known Lowther before their alleged rapes varied; that only C.H. and C.R. described house party "situations"; that none of the rule 404(b) witnesses had their underwear pushed aside like K.S.; and that none of the rule 404(b) witnesses were penetrated in the same position as K.S.[1]

---

1. Lowther does not specifically tie his similarity argument to *Verde*; rather, he painstakingly differentiates his case from other rape cases in which rule 404(b) evidence was admitted under other theories, i.e., to show a pattern of behavior or modus operandi. *See, e.g., State v. Nelson-Waggoner*, 2000 UT 59, ¶¶ 22–25, 6 P.3d 1120; *State v. Marchet*, 2009 UT App 262, ¶¶ 31, 39, 219 P.3d 75; *see also State v. Verde*, 2012 UT 60, ¶ 53, 296 P.3d 673 ("Probability reasoning is also the best understanding of our analysis in *State v. Nelson-Waggoner*, 2000 UT 59, 6 P.3d 1120."). In particular, he asks this court to identify "the minimum number of similarities that are necessary to allow the introduction of the other acts as probative of consent or another 404(b) purpose." However, "[a]ny prescription of a threshold of

(continued…)

¶16    First, we recognize that both Lowther's and the trial court's seemingly opposing characterizations of the women's familiarity with Lowther are supported by the record; K.S. and A.P. specifically described themselves as acquaintances of Lowther. C.R. described Lowther as a friend, and C.H. testified that she had never met Lowther until that night. While certainly C.R., as a friend of Lowther's for several years, would have been more familiar with Lowther than A.P. and K.S., who had met him through mutual friends a few times in the past, we nonetheless consider this factor to weigh in favor of similarity. Like K.S., two of the rule 404(b) witnesses, C.R. and A.P., were in some way acquainted with Lowther before the alleged incidents occurred. Only C.H. was a stranger.

---

(…continued)

similarity for admitting similar accusations evidence is inevitably imprecise." *Verde*, 2012 UT 60, ¶ 59. The analysis under rule 404(b) is necessarily case-specific, and the required degree of similarity between the charged and uncharged conduct varies depending on the noncharacter purpose sought. *See* Edward J. Imwinkelried, *The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition*, 51 Ohio St. L.J. 575, 589–90 (1990) (indicating that generally "the required degree of similarity" to "trigger the doctrine of chances" is "not as great as the degree necessary to invoke the modus operandi theory"). As a result, we cannot provide a specific minimum number of similarities required in rule 404(b) cases, and we do not endeavor to do so. We recognize that more similarities may exist in other cases, as Lowther has argued, but we are not persuaded that the apparent strength of the rule 404(b) evidence in any other case necessarily undermines the admissibility of the rule 404(b) evidence in this case.

¶17 Next, we disagree with Lowther's assertion that only two women described house party "situations"—all of the women except for K.S. described house party "situations." However, we agree with Lowther that this similarity *among* the rule 404(b) witnesses is of little import here; the similarities relevant to a rule 404(b) analysis are those that exist between each rule 404(b) witness and the complaining witness. The three rule 404(b) witnesses' testimonies that they attended house parties is not similar to K.S.'s testimony regarding a movie premiere. Nevertheless, all of the women had encounters with Lowther after they consumed enough alcohol to feel impaired, the women were of similar ages, and they all alleged that they had been raped in the early morning, after they had fallen asleep or passed out from alcohol. All of the alleged incidents occurred in private residences at which Lowther was a guest. In each case, Lowther was aware that the women had been drinking, and in each situation, the women alleged that Lowther's sex acts were what roused them to consciousness.[2]

¶18 We recognize that there are also several differences between K.S.'s and the rule 404(b) witnesses' testimonies. For

_____

2. Arguably, A.P.'s testimony differs on this point where it seems she drifted in and out of consciousness during the alleged rape. However, the only factor on which Lowther admits all four women's stories were similar goes to their levels of consciousness. Lowther contends, though, that this factor must be analyzed under *State v. Denos*, 2013 UT App 192, 319 P.3d 699, and that the trial court's failure to apply *Denos* indicates that the court did not scrupulously examine the evidence. While *Denos* illustrates how an alleged victim's consciousness can show a lack of consent, *see id.* ¶ 22, a comparative analysis to *Denos* is by no means required every time a similar fact pattern arises. Thus, the trial court's failure to analyze *Denos* in this case does not dictate our outcome on appeal.

instance, the trial court concluded that in every case, Lowther "did not stop when [the women] resisted," which is simply not supported by the record. In fact, K.S. testified that Lowther *did* stop when she resisted, and C.R. similarly testified that Lowther stopped when she kicked him and told him to go home. On the other hand, C.H. testified that she had to push Lowther for some time before he stopped and A.P. testified that she repeatedly told Lowther "no" but that he did not stop. C.R. testified to object rape, i.e., Lowther penetrated her vagina with his fingers, unlike the other women who testified that Lowther penetrated their vaginas with his penis. Likewise, the level of intoxication experienced by each woman at the time of the alleged encounters with Lowther varied—K.S. testified that she was at a two out of ten; A.P. that she was at a seven, eight, or nine; C.R. that she was at a four, five, or six; and C.H. that she did not feel intoxicated at the time of the alleged rape. Additionally, A.P.'s testimony depicts a far different scenario than K.S. and the other rule 404(b) witnesses described: A.P. described being locked in a room with Lowther, forcibly pinned down by him, and intoxicated to the point that she was physically ill and fading in and out of consciousness.

¶19 Nonetheless, we agree with the trial court's conclusion that the scenarios described by C.R., A.P., and C.H. were sufficiently similar to the scenario described by K.S. to satisfy the similarity prong of the *Verde* test. Accordingly, the trial court did not abuse its discretion in reaching this conclusion.[3] *See State v. Verde*, 2012 UT 60, ¶¶ 58–59, 296 P.3d 673.

---

3. In the course of this opinion, we evaluate the degree of similarity and the specific similarities and dissimilarities between the prior bad acts evidence and K.S.'s testimony in different contexts. Here, we conclude that there are sufficient general similarities in the evidence to sustain the trial court's rulings on the relevance inquiries under its rule 404(b) analysis.

(continued…)

¶20    Lowther's argument on appeal does not address the trial court's analysis of the rule 404(b) evidence under the remaining *Verde* factors of materiality, frequency, and independence and instead focuses on the trial court's rule 403 balancing test and application of the factors outlined in *State v. Shickles*, 760 P.2d 291 (Utah 1988). Accordingly, we do not consider the trial court's analysis of the relevance and noncharacter purpose of the rule 404(b) evidence under the materiality, frequency, and

---

(…continued)

In other words, we affirm the trial court's determination that the prior bad acts evidence is relevant for the noncharacter purpose of demonstrating K.S.'s lack of consent. *See generally Nelson-Waggoner*, 2000 UT 59, ¶¶ 18–19 (explaining that for bad acts evidence to be admissible, the trial court must first determine if the evidence is offered for a noncharacter purpose and is relevant under rule 402 of the Utah Rules of Evidence); *id*. ¶ 24 (recognizing that bad acts evidence offered to prove the victim's lack of consent may be "both relevant and material to the issue of consent and therefore properly admissible" (citation and internal quotation marks omitted)). However, we conclude that the dissimilarities, particularly in regard to A.P.'s testimony, raise concerns as to whether the probative value of that testimony is outweighed by the risk of unfair prejudice under rule 403 of the Utah Rules of Evidence. *See infra* ¶¶ 27, 32. Under *Verde*, we evaluate the same four factors of materiality, similarity, independence, and frequency both to discern the relevance of the proposed bad acts evidence and to weigh the evidence's probative value against its prejudicial effect. *See State v. Labrum*, 2014 UT App 5, ¶ 28, 318 P.3d 1151 (explaining that for a rule 403 analysis in cases relying on the doctrine of chances, *Verde* displaces the *Shickles* factors, but also noting that one of the *Shickles* factors involves weighing the similarities in the evidence); *see also State v. Shickles*, 760 P.2d 291, 295–96 (Utah 1988).

independence factors in *Verde*'s doctrine of chances analysis and next address the trial court's rule 403 balancing test.

### III. Rule 403 Balancing

¶21 Lowther argues that the rule 404(b) evidence should be excluded because the probative value of the evidence is outweighed by its potential for unfair prejudice, confusing the issues, and misleading the jury under rule 403 of the Utah Rules of Evidence. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Utah R. Evid. 403. "Evidence that is 'genuinely being offered for a proper, non-character purpose' may also carry 'a risk of an undue inference that the defendant committed each act because of the defendant's immoral character.'" *State v. Labrum*, 2014 UT App 5, ¶ 25, 318 P.3d 1151 (quoting *Verde,* 2012 UT 60, ¶¶ 18, 51); *see also State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841 (requiring that "the probative value of the evidence . . . be *substantially* outweighed by the danger of *unfair* prejudice; and unfair prejudice results only where the evidence has an undue tendency to suggest decision upon an improper basis" (footnote, citations, and internal quotation marks omitted)).

¶22 In cases applying the doctrine of chances, the rule 403 "prejudice inquiry is focused generally on the extent to which the 'tendency [of the other acts evidence] to sustain a proper inference is outweighed by its propensity for an improper inference or for jury confusion about its real purpose.'" *Labrum*, 2014 UT App 5, ¶ 28 (alteration in original) (quoting *Verde*, 2012 UT 60, ¶ 18). Although a court's analysis under rule 403 is often guided by the *Shickles* factors, "[w]here the context involves a doctrine of chances analysis, we read *Verde* as having displaced the *Shickles* factors." *Id*. *See generally Shickles*, 760 P.2d at 295–96 (enumerating six factors to guide a court's analysis under rule

403 of the Utah Rules of Evidence). Thus, the rule 403 focus under the doctrine of chances is "on the risk that the jury may draw an improper 'character' inference from the evidence or that it may be confused about the purpose of the evidence." *Labrum*, 2014 UT App 5, ¶ 28; *see also People v. Balcom*, 867 P.2d 777, 787 (Cal. 1994) (in bank) (Arabian, J., concurring) (advising trial courts to conduct a balancing analysis when addressing evidence offered under the doctrine of chances by considering "such factors as the degree of similarity, the remoteness of the other crime, the independence of the complaining witness from the victim of the other crime, whether the other crime is particularly inflammatory relative to the instant crime, and whether [the] defendant has been convicted of the other crime"), *cited by Verde*, 2012 UT 60, ¶ 48.

¶23    Lowther identifies several concerns that the trial court failed to address, namely, the risk that the three rule 404(b) witnesses' testimonies would "dominat[e] the testimony in the K.S. case" and render the trial less about "what happened with K.S." and more "about what happened with the other women." He argues that this placed him in the position of having to defend against four cases at once. Further, Lowther identifies several credibility problems with each witness and notes that the "lengthy cross examination" he would be required to engage in at trial would "draw[] more attention to the other women's cases when they are supposed to be considered in a very limited light." In particular, Lowther argues that "A.P. and C.H. testified dissimilarly from the preliminary hearing to the 404(b) hearing" and that "A.P.'s recollection of the event could best be characterized as spotty, with significant gaps of time during which she had no recollection."

¶24    Here, the trial court applied the *Shickles* factors. The court concluded that the rule 404(b) evidence was strong because it was comprised of "three other alleged victims [that] will testify at trial," that the evidence was sufficiently similar for the reasons identified in its *Verde* analysis, that the ten-month period

between the four alleged acts was relatively short for rule 403 purposes, that the State needed the evidence to "shed[] light on Mr. Lowther's intent and lack of the victims' consent," that alternative proof of Lowther's intent was not available and could "be inferred by the repetition of similar conduct," and that although "other acts of sexual abuse [were] undoubtedly prejudicial to the accused[,] . . . the probative value of introducing the additional allegations outweigh[ed] the degree to which it might rouse the jury." *See Shickles*, 760 P.2d at 295–96. As to this last point, the trial court also noted that "Utah courts infrequently find that the prejudice would unfairly outweigh the probative value of evidence."

¶25    Given this court's decision in *State v. Labrum*, 2014 UT App 5, 318 P.3d 1151, to interpret *Verde* as replacing *Shickles*, *see id.* ¶ 28, the trial court's strict adherence to *Shickles* here is misplaced. Moreover, we are concerned that the court's application of *Shickles* actually misdirected its rule 403 analysis, causing it to focus on the "limited list of considerations outlined in *Shickles*" instead of focusing on the "text of rule 403," which requires the court to balance the probative value of the prior bad acts evidence against the danger of unfair prejudice. *See Lucero*, 2014 UT 15, ¶ 32 ("[C]ourts are bound by the text of rule 403, not the limited list of considerations outlined in *Shickles*."). In *State v. Lomu*, 2014 UT App 41, 321 P.3d 243, this court considered a case in which prior bad acts evidence was "offered in contemplation of the 'doctrine of chances'" and in which the trial court applied the *Shickles* framework, rather than *Verde*'s "new analytical framework." *Id.* ¶ 28. There, we addressed the rule 403 balancing test and concluded that despite the trial court's reliance on the *Shickles* factors, "there [were] sufficient grounds to affirm the trial court's admission of the evidence based on *Verde*'s foundational requirements." *Id.* Thus, we will now consider the trial court's rule 403 analysis under the *Verde* factors— materiality, similarity, independence, and frequency—to determine whether sufficient grounds for admission exist here

despite the court's application of a different analytical framework. *See id.* ¶¶ 28–33.

¶26 The first *Verde* factor, materiality, requires that "[t]he issue for which the uncharged misconduct evidence is offered . . . be in bona fide dispute." *State v. Verde*, 2012 UT 60, ¶ 57, 296 P.3d 673 (emphasis, citation, and internal quotation marks omitted). Here, as the trial court recognized, Lowther's assertion that K.S. consented is in dispute, and the State offered the prior bad acts evidence to rebut that defense and to demonstrate a lack of consent. *See Balcom*, 867 P.2d at 785–86 (Arabian, J., concurring) (explaining that prior bad acts evidence in rape cases in which consent is the primary issue at trial is relevant because it helps "the jury decide who is telling the truth" by "corroborat[ing] the complaining witness's testimony").

¶27 Second, as described above, *see supra* ¶ 14, "there must be some significant similarity between the charged and uncharged incidents to suggest a decreased likelihood of coincidence." *Verde*, 2012 UT 60, ¶ 58. As discussed, there are general similarities among all four women's testimonies and more striking similarities between K.S.'s testimony and C.R.'s and C.H.'s testimonies. However, the differences in A.P.'s testimony from K.S.'s, particularly A.P.'s testimony that Lowther physically restrained her in a locked room and that her extreme level of intoxication rendered her especially vulnerable, could be "particularly inflammatory relative to the instant crime." *See People v. Balcom*, 867 P.2d 777, 788 (Cal. 1994) (in bank) (Arabian, J., concurring).

¶28 Third, "each accusation must be independent of the others." *Verde*, 2012 UT 60, ¶ 60. Here, as the trial court stated, each woman "related independent stories of similar occurrences" and there is otherwise no evidence in the record that the women "collaborated" in making their accusations. *See Lomu*, 2014 UT App 41, ¶ 31; *see also Verde*, 2012 UT 60, ¶ 60.

¶29 Last, the frequency element requires that "[t]he defendant . . . have been accused of the crime or suffered an unusual loss more frequently than the typical person endures such losses accidentally." *Verde*, 2012 UT 60, ¶ 61 (emphasis, citation, and internal quotation marks omitted). Here, the trial court concluded that this factor was met because the rule 404(b) evidence amounts to "[t]hree additional charges against Mr. Lowther of sexual assaults—all within a 10 month period." We agree that this factor is met. Thus, we agree that the rule 404(b) evidence is probative of K.S.'s lack of consent.

¶30 Next, we "consider whether the potential for prejudice or confusion from admitting the evidence substantially outweighed its probative value." *See State v. Lomu*, 2014 UT App 41, ¶ 33, 321 P.3d 243. In *Lomu*, we held that because the rule 404(b) evidence described an "almost identical" crime, the evidence was "extremely probative" in determining the defendant's intent. *Id.* ¶¶ 30, 32 (citation and internal quotation marks omitted). And in light of that "extreme" probativeness, we considered the fact that the jury received a limiting instruction sufficient to ensure that the risk that "the jury would convict on an improper basis was remote." *Id.* ¶ 33.

¶31 Here, we assume a limiting instruction would also have been used in this case had it proceeded to a jury trial. But, the rule 404(b) evidence is not "almost identical" to K.S.'s testimony, nor is it "extremely probative" of whether K.S. actually consented. Indeed, some courts, in addressing rape cases in which consent was the only element in dispute, "have concluded that evidence of the accused's other acts is simply not admissible . . . , since '[t]he fact that one woman was raped . . . has no tendency to prove that another woman did not consent.'" Mark Cammack, *Using the Doctrine of Chances to Prove Actus Reus in Child Abuse and Acquaintance Rape:* People v. Ewoldt *Reconsidered*, 29 U.C. Davis L. Rev. 355, 395 (1996) (alteration and second omission in original) (quoting *Lovely v. United States,* 169 F.2d 386, 390 (4th Cir. 1948)). However, other courts, including one

cited favorably by our supreme court in *Verde*, identify evidence of similar rapes in cases like this as "particularly important" "corroborating evidence" that "the jury [should] be allowed to consider" because "[i]n making the momentous decision of guilt or innocence of rape, the jury needs all the evidence available." *See Balcom*, 867 P.2d at 785 (Arabian, J., concurring); *see also State v. Nelson-Waggoner*, 2000 UT 59, ¶ 24, 6 P.3d 1120 (recognizing that prior bad acts evidence "is not conclusive proof that the [victim] did not consent," but considering "such evidence . . . both relevant and material to the issue of consent and therefore properly admissible" (alteration in original) (citations and internal quotation marks omitted)).

¶32 Although some of the rule 404(b) evidence here may be "particularly important" to "corroborat[e]" the complainant's allegations, *see People v. Balcom*, 867 P.2d 777, 785 (Cal. 1994) (in bank) (Arabian, J., concurring), we conclude that the trial court did not adequately "balanc[e] the proper inferences" that may be drawn from the State's rule 404(b) evidence "against the improper inferences" that the evidence also allows, *see State v. Labrum*, 2014 UT App 5, ¶ 25, 318 P.3d 1151. We are particularly concerned about A.P.'s testimony. In regard to A.P., the court failed to consider the major differences in her account and instead evaluated her testimony primarily for the general similarities it shared with K.S.'s allegations. A.P.'s testimony that she was pinned down and raped by Lowther in a locked room while she was vomiting with alcohol poisoning and fading in and out consciousness carries little probative value in terms of showing that K.S. did not consent. The trial court did not address the tendency of these differences "to suggest decision upon an improper basis," *see State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841 (citation and internal quotation marks omitted), and instead indicated that "Utah courts infrequently find that the prejudice would unfairly outweigh the probative value of evidence." We conclude that A.P.'s testimony encourages a verdict on an improper basis and should have been excluded by

the trial court. Additionally, in light of C.H.'s and C.R.'s testimonies, A.P.'s testimony is largely cumulative.

¶33    Last, even though the trial court erred in conducting its rule 403 analysis, "we will only reverse if the error was harmful." *State v. Lindgren*, 910 P.2d 1268, 1273 (Utah Ct. App. 1996). "A trial court's error is harmful if absent the error there is a reasonable likelihood of an outcome more favorable to the defendant." *Id.* (citation and internal quotation marks omitted). To discern whether a trial court's error was harmful, the appellate court must ascertain "from the record what evidence *would have been* before the jury absent the trial court's error." *Id.* at 1274. Although Lowther entered a conditional no-contest plea and did not proceed to trial, we can assume that all of the rule 404(b) evidence would have been before the jury given the trial court's ruling on the evidence. And where the State's case against Lowther appears to hinge on the rule 404(b) evidence, we cannot say that the evidence would have been harmless. We assume that the trial court's error in granting the State's motion as to A.P. is not harmless. *See id.* (assuming an error was harmful in the context of reviewing a defendant's conditional guilty plea). Accordingly, we reverse the trial court's ruling as to the admissibility of A.P.'s testimony, which provides Lowther with the opportunity to withdraw his conditional plea. *See* Utah R. Crim. P. 11(j) ("A defendant who prevails on appeal shall be allowed to withdraw [a conditional] plea.").

¶34    Having determined that the trial court did not properly examine A.P.'s testimony under rule 403, we must also reverse the trial court's ruling as to the other rule 404(b) witnesses. However, because we have not determined that C.R.'s and C.H.'s testimonies were necessarily admitted in error, we remand the case for further proceedings, i.e., to allow the trial court to reconsider C.R.'s and C.H.'s testimonies under the proper legal framework and without consideration of A.P.'s testimony. *See State v. Verde*, 2012 UT 60, ¶¶ 58, 61, 296 P.3d 673

(identifying similarity and frequency as key characteristics for admission of rule 404(b) evidence under the doctrine of chances).

CONCLUSION

¶35    The trial court did not abuse its discretion by relying on the doctrine of chances in reaching its decision to grant the State's motion to admit evidence under rule 404(b). However, the trial court failed to scrupulously examine the proposed rule 404(b) evidence in evaluating the evidence's admissibility under rule 403. We therefore reverse the trial court's ruling as to A.P.'s testimony and reverse and remand its ruling in regard to the testimonies of C.H. and C.R. for further proceedings in accordance with this decision.

———————